Yaman Salahi (Bar No. 288752)
Nasrina Bargzie (Bar No. 238917)
ASIAN AMERICANS ADVANCING JUSTICE—ASIAN LAW CAUCUS
55 Columbus Ave.
San Francisco, California 94111-2101
Telephone: + 1 (415) 848-7711
Facsimile: + 1 (415) 896-1702
Email: yamans@advancingjustice-alc.org; nasrinab@advancingjustice-alc.org

Wendy L. Feng (Bar No. 200813)
Joanne Sum-Ping (Bar No. 296552)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, California 94111-5356
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091
Email:  wfeng@cov.com; jsumping@cov.com

*Attorneys for Plaintiff Mosed Shaye Omar*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MOSED SHAYE OMAR<br><br>Plaintiff,<br><br>v.<br><br>JOHN KERRY, Secretary of State, in his official capacity; MICHELE T. BOND, Acting Assistant Secretary for Consular Affairs, in her official capacity; BRENDA SPRAGUE, Deputy Assistant Secretary for Passport Services, in her official capacity; U.S. DEPARTMENT OF STATE,<br><br>Defendants. | Civil Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**Administrative Procedure Act Case** |

**INTRODUCTION**

1.      In July of 2012, Plaintiff and U.S. citizen Mosed Shaye Omar travelled from San Francisco to Yemen to obtain a U.S. passport for his youngest daughter and bring her home with him.  Six months later, a representative from the U.S. Embassy in Sana'a summoned Mr. Omar to the Embassy with "good news" that his daughter's passport was ready for pick up.  But when Mr. Omar arrived at the Embassy, he did not receive his daughter's passport.  Instead, Embassy officials confiscated Mr. Omar's own passport, subjected him to repeated interrogation, and detained him for over eight hours.  During this time Mr. Omar, who suffers from several chronic medical conditions, was deprived of food and water, watched over by armed guards, and cut off from any means of contacting his friends and family.  Mr. Omar was given no choice but to sign a written statement—and when he finally did, his passport was illegally revoked.

2.      Despite repeated inquiries, Defendants did not provide Mr. Omar with written notice explaining the reasons for the revocation or how to appeal it until December 2013.  Meanwhile, Defendants did not provide him with any way to return home.  Mr. Omar remained stranded in Yemen until February 2014.

3.      Although Mr. Omar did not understand the statement that he signed at the time, he later learned that it said that his "true and correct name" is not in fact "Mosed Shaye Omar," but some other name.  The statement was not only involuntary, but also false, as Mosed Shaye Omar is Mr. Omar's true name and the name he has used since childhood.

4.      Mr. Omar finally returned to the U.S. using a temporary travel document in February 2014.  When Defendants eventually held a hearing to review the passport revocation, they summarily upheld it *solely* on the basis of the statement that Mr. Omar had signed at the Embassy, despite his unrebutted testimony and documentary evidence demonstrating that the statement was involuntary and false.

5.      Mr. Omar brings this action to ask the Court to require Defendants to return his wrongfully revoked passport, to declare that Defendants overstepped their constitutional and statutory authority, and to declare Mr. Omar's due process rights.

**PARTIES**

6. Plaintiff Mosed Shaye Omar is a U.S. citizen and a resident of San Francisco, California. He was born in Yemen in 1951. In 1972, the U.S. Embassy in Sana'a issued Mr. Omar an immigration visa based on his adoption by a U.S. citizen. Mr. Omar was duly admitted to the United States in 1972. In 1978, Mr. Omar was naturalized in federal district court in Detroit, Michigan and was issued a judicial certificate of naturalization in the name "Mosed Shaye Omar."

7. Defendant John F. Kerry is the United States Secretary of State and is sued in his official capacity. Defendant Kerry is empowered by statute to grant, issue, and cause passports to be granted. *See* 22 U.S.C. § 211a.

8. Defendant Michele T. Bond is the Acting Assistant Secretary for Consular Affairs for the U.S. Department of State and is sued in her official capacity. In this position, Defendant Bond oversees the Bureau of Consular Affairs, which has been delegated the authority to adjudicate U.S. passports at Embassies and Consulates outside the United States in the Office of Passport Services. *See* 7 F.A.M. § 1311(e).

9. Defendant Brenda Sprague is the Deputy Assistant Secretary for Passport Services for the U.S. Department of State and is sued in her official capacity. Defendant Sprague oversees the Office of Passport Services and is empowered to make final decisions concerning the revocation of U.S. passports. *See* 22 C.F.R. § 51.74. Defendant Sprague made the State Department's final decision upholding the revocation of Plaintiff's passport.

10. Defendant U.S. Department of State (the "State Department" or "Department") is a federal agency responsible for overseeing the issuance of U.S. passports and protecting and assisting U.S. citizens living or traveling abroad.

**JURISDICTION AND VENUE**

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702, *et seq.*

12. This Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 and § 2202.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events giving rise to this action occurred in San Francisco County, and pursuant to 28 U.S.C. § 1391(e)(1)(C) because plaintiff resides in this district, this action involves no real property, and defendants are all agencies, employees, or officers of the United States acting in their official capacities.

## INTRADISTRICT ASSIGNMENT

14.     Pursuant to Local Rule 3-2(c) and (d), assignment to the San Francisco division is proper because a substantial part of the events giving rise to this action occurred in San Francisco County.

## STATUTORY AND REGULATORY FRAMEWORK
## FOR REVOCATION OF U.S. PASSPORTS

15.     The United States Supreme Court has recognized that the freedom to travel internationally is part of the "liberty" protected by the Fifth Amendment due process clause. A U.S. citizen generally requires a valid U.S. passport to exercise that freedom. *See* 8 U.S.C. § 1185(b).

16.     The U.S. Secretary of State is empowered by statute to grant and issue U.S. passports. *See* 8 U.S.C. § 211a.

17.     An individual applying for a U.S. passport must provide evidence of citizenship and identity. *See* 22 C.F.R. §§ 51.23, 51.40.

18.     The Department's regulations specify that proof of identity includes "the submission of a previous passport, other state, local, or federal government officially issued identification with photograph, or other identifying evidence which may include an affidavit of an identifying witness." *See* 22 C.F.R. § 51.23(b). A judicial Certificate of Naturalization meets these criteria as an officially-issued identification with a photograph.

19.     The Department's regulations specify that proof of citizenship includes a judicial certificate of naturalization. *See* 22 C.F.R. §§ 51.41, 51.43(b)(1)(i).

20.     If the applicant satisfies these conditions, then a U.S. passport "shall be issued in the full name of the applicant, generally the name recorded in the evidence of nationality and identity." *See* 22 C.F.R. § 51.25(a). The Department accommodates deviations from a person's name

of record in some circumstances. *See* 7 F.A.M. § 1300, Appendix C ("Names to be Used in Passports").

21.    At issue in this case is the statutory provision authorizing the Secretary of State "to cancel any United States passport . . . if it appears that such document was illegally, fraudulently, or erroneously obtained from, or was created through illegality or fraud practiced upon, the Secretary." 8 U.S.C. § 1504(a). The Department codified this statute in its regulations at 22 C.F.R. § 51.62(a)(2) (passport may be revoked if "[t]he passport has been obtained illegally, fraudulently, or erroneously; was created through illegality or fraud practiced upon the Department; or has been fraudulently altered or misused"). *See, also,* Nationality Procedures Report of Birth Regulation; Passport Procedures Revocation or Restriction of Passports Regulation, 64 Fed. Reg. 19713, 19713 (Apr. 22, 1999).

22.    When a passport is revoked pursuant to 8 U.S.C. § 1504(a), the affected individual "shall be given… written notice of the cancellation" "together with the procedures for seeking a prompt post-cancellation hearing." *Id. See also*, 22 C.F.R. § 51.65(a) ("The Department will notify in writing any person whose application for issuance of a passport has been denied, or whose passport has been revoked.").

23.    The hearing is presided over by a hearing officer appointed by the Department who is tasked with "mak[ing] findings of fact and submit[ting] recommendations based on the record of the hearing… to the Deputy Assistant Secretary for Passport Services in the Bureau of Consular Affairs." *See* 22 C.F.R. § 51.71(a).

24.    The hearing officer "may not consider any information that is not also made available to the person requesting the hearing and made a part of the record of the proceeding." *See* 22 C.F.R. § 51.71(d). Both the individual and the Department may submit testimony, evidence, or witnesses at the hearing. *See* 22 C.F.R. § 51.71(c). The individual may be represented by counsel. *See* 22 C.F.R. § 51.71(b). The hearing officer "may impose reasonable restrictions on relevancy, materiality, and competency of evidence presented." *See* 22 C.F.R. § 51.71(d).

25.    Because the hearing involves deprivation of a significant liberty interest, the standard of proof under the Fifth Amendment of the United States Constitution should require the Department to sustain a revocation by clear and convincing evidence.

26.    The hearing officer makes findings of fact and recommendations, which the Deputy Assistant Secretary for Passport Services relies on in deciding whether to uphold the denial or revocation of a passport. The Deputy Assistant Secretary for Passport Services' decision is the agency's final decision. *See* 22 C.F.R. § 51.74.

## LEGAL CONTEXT FOR CHALLENGES TO U.S. CITIZENSHIP

27.    Under long-standing judicial precedent, a judicial Certificate of Naturalization is a conclusive judgment of citizenship, complete evidence of its own validity, and immune from collateral attack.

28.    If the government suspects an individual naturalized fraudulently, its only recourse is to institute a denaturalization proceeding pursuant to 8 U.S.C. § 1451(a).

29.    In 1960, the Attorney General of the United States rejected the State Department's attempt to re-litigate previously-adjudicated determinations of citizenship. *See* 41 U.S. Op. Atty. Gen. 452, 459 (1960).  The Attorney General concluded that, just as the State Department may not question a judicial certificate of citizenship, it may not challenge a certificate of citizenship issued by another agency pursuant to statutory authority.

30.    Upon information and belief, the Department's internal guidelines, as set forth in non-public provisions of the Foreign Affairs Manual, instruct consular officers that they must accept a judicial certificate of naturalization at face value. *See* 7 F.A.M. § 1381.2(d)(1) ("Certificates of Naturalization or Citizenship are proof of United States citizenship. Accordingly, an individual remains eligible for a U.S. passport until his/her Certificate of Naturalization or Certificate of Citizenship is revoked by U.S. Citizenship and Immigration Services (USCIS) or a U.S. District court . . . ."); 7 F.A.M. § 1381.2(d)(2) ("The certificate [of citizenship] stands on its own and cannot be questioned"); 7 F.A.M. § 1381.2(d)(3) ("Generally, if an applicant's name hits against an 'N' or 'Q' CLASS reason code [i.e., suspicion of no claim to U.S. citizenship or questionable claim] when

the individual presents either a Certificate of Naturalization or Citizenship, you must issue a full validity passport.").

31. Upon information and belief, these provisions of the Foreign Affairs Manual were in effect between January 23, 2013 (the date of Mr. Omar's interrogation) and December 15, 2013 (the date on which Mr. Omar was provided written notice explaining his revocation).

32. Upon information and belief, these provisions of the Foreign Affairs Manual remain in effect today.

## FACTUAL ALLEGATIONS

33. Mr. Omar alleges the following based on the administrative record related to the revocation of his U.S. passport.

### MR. OMAR OBTAINS A PASSPORT UNDER HIS LEGAL NAME:
### "MOSED SHAYE OMAR"

34. "Mosed Shaye Omar" was the name Mr. Omar had used when he lived in Yemen prior to immigrating to the United States in 1972, as demonstrated by evidence submitted in his revocation hearing, including a 1972 vaccination record and the testimony of four individuals who knew Mr. Omar in Yemen by the name "Mosed Shaye Omar" and do not know him to have any other name.

35. On April 10, 1978, the United States District Court in Detroit, Michigan entered an order naturalizing Mr. Omar and issued a Certificate of Naturalization to him in the name Mosed Shaye Omar. The Certificate of Naturalization contains a physical description and photograph that matches Mr. Omar, and it is undisputed that Mr. Omar was in fact naturalized by the United States District Court and that the District Court in fact issued a Certificate of Naturalization to Mr. Omar in the name "Mosed Shaye Omar." Mr. Omar obtained a replacement Certificate of Naturalization in 1982, which was submitted to the Department with his submission challenging the revocation of his passport.

36. Mr. Omar has been issued additional government documents, such as a Social Security Card and California Driver License, in his name, Mosed Shaye Omar. The State

Department did not dispute the authenticity of these documents, nor did it allege he had ever obtained these documents in any other name.

37.   Mr. Omar has also filed his U.S. tax returns under his legal name: Mosed Shaye Omar.  The State Department did not dispute this fact, nor did it allege that Mr. Omar has ever filed a tax return in any other name.

38.   In 2007, Mr. Omar submitted an application to renew his passport.  In the section entitled "Name of Applicant," Mr. Omar wrote the name: Mosed Shaye Omar.  Mr. Omar has no identification or documentation in any name other than Mosed Shaye Omar.

39.   On November 15, 2007, the State Department issued a passport to Mr. Omar in his legal name: Mosed Shaye Omar.  This is consistent with State Department regulations providing that a "passport shall be issued in the full name of the applicant, generally the name recorded in the evidence of nationality and identity."  22 C.F.R. § 51.25.

## MR. OMAR TRAVELS TO YEMEN TO OBTAIN A U.S. PASSPORT

## FOR HIS YOUNGEST DAUGHTER

40.   Mr. Omar traveled to Yemen in July 2012 to bring his youngest daughter K.O., who was born in Yemen in 1999, back to the United States with him so she could live with her older siblings. He had planned for a short stay to sort out the necessary paperwork. On August 14, 2012, Mr. Omar went to the U.S. Embassy in Sana'a for an interview related to K.O's U.S. passport application. He was told the Embassy would call him once the application had been processed.

41.   Mr. Omar's diabetes and chronic heart conditions leave him dependent on close medical supervision and medications that can be obtained in the United States but not in Yemen. Over the next several months, Mr. Omar inquired about the status of his daughter's passport application and informed the Embassy that, for medical reasons, he would need to travel back to the United States.

42.   By December 2012, Mr. Omar urgently needed to return to the U.S. for his health and made arrangements to do so.

43.    Shortly before his flight home, Mr. Omar received a call from a U.S. Embassy official saying there was good news about his daughter's passport and that Mr. Omar should come to the Embassy.

### INTERROGATION OF MR. OMAR AT THE U.S. EMBASSY IN SANA'A

44.    Mr. Omar went to the Embassy around 7 a.m. on January 23, 2013, expecting to pick up K.O's passport.  To enter the Embassy, Mr. Omar passed through multiple security checkpoints.  In the consular portion of the Embassy, Mr. Omar was called to a window where a consular official asked for his passport. After Mr. Omar handed over his U.S. passport, the official instructed Mr. Omar to sit in the waiting room. The consular official did not return Mr. Omar's passport to him.

45.    Around 8 a.m., two Embassy personnel called Mr. Omar's name and instructed him to follow them. They escorted him out of the general waiting area and out of the consular building to other parts of the Embassy complex. To enter the new building, the group had to pass through several locked doors and secure areas that were not accessible to the public. On the way to the new building, Mr. Omar saw only armed U.S. military personnel dressed in military attire. Mr. Omar had never been taken to these parts of the Embassy in the past, despite several consular appointments over the course of decades. Mr. Omar was intimidated by the environment.

46.    In the second building, the group passed through locked doors that had to be specially unlocked by Embassy personnel. Inside the building, Mr. Omar saw more armed guards. The two Embassy personnel took Mr. Omar into a small interrogation room.

47.    In addition to Mr. Omar there were three other people in the room. One turned out to be a sworn federal law enforcement official in the Diplomatic Security Service, and another acted in part as an interpreter. The third man was also an American who appeared to be supervising the process; however, he did not speak to Mr. Omar.

48.    According to the Department of State's website, the Diplomatic Security Service is the law enforcement arm of the U.S. Department of State.

49.     Upon information and belief, the interrogator in the room with Mr. Omar was Diplomatic Security Service Agent David W. Howell. Mr. Omar was not aware of Mr. Howell's name or position at the time.

50.     Agent Howell told Mr. Omar he had been sent to the Embassy in Sana'a to "clean up" their files, and that Mr. Omar's file was one of those that needed "cleaning up" so his daughter K.O.'s passport application could be processed.

51.     Agent Howell did not advise Mr. Omar of his right to remain silent or his right to an attorney before interrogating him.

52.     For about an hour, Agent Howell—through the interpreter—asked Mr. Omar questions about his family, his immigration history, and his name. Mr. Omar told Agent Howell that his name was Mosed Shaye Omar, and that he had used that name his entire life.

53.     Afterward, Mr. Omar was escorted out of the secure hallway and secure building back to the general waiting area where he was told to wait.

54.     Around 11 a.m., Mr. Omar was escorted back to the interrogation room and questioned for another hour. From the room, Mr. Omar could see armed American soldiers in the hallway.

55.     During this second interrogation, the interpreter joined in as an interrogator, rather than as a neutral party. Instead of simply translating Agent Howell's questions, the interpreter appeared to add questions of his own and pressured Mr. Omar to tell Agent Howell what he wanted to hear.

56.     Around noon, Agent Howell and the interpreter escorted Mr. Omar back to the general waiting area and instructed him to wait there.

57.     At this point, Mr. Omar, who suffers from diabetes, high blood pressure, and other medical conditions, had not had access to food, water, or his medication since arriving at the Embassy five hours earlier. He felt ill and his vision was blurred. Mr. Omar had no way to call his family or friends for help, as mobile phones are not permitted in the Embassy and no public phone is available. He continued to wait in this worsening physical state for hours.

58.     By approximately 4 p.m., Mr. Omar was the only person left in the general waiting area, except for a guard by the general entrance. Overwhelmed, Mr. Omar approached the guard and told him something to the effect of, "I'm sick and exhausted, I'll do anything, I want to go home, just give me my passport." The guard left to inform Embassy personnel. Shortly afterward, Mr. Omar was escorted back to the interrogation room.

59.     When Mr. Omar arrived in the interrogation room, he was given a paper (the "Interrogation Statement"). The interpreter told Mr. Omar to just sign the paper, and then go pick up the passports from the consul. Mr. Omar has limited English proficiency and cannot understand such documents on his own; but the interpreter did not explain or translate the paper to Mr. Omar. Furthermore, by this point Mr. Omar's vision was too blurred for him to read the statement himself.

60.     Unaware of its contents and having been told that signing was the way to retrieve his passport and leave the Embassy, Mr. Omar signed the Interrogation Statement with his name, "Mosed S. Omar," and the interpreter took his thumbprint.

61.     Although Mr. Omar was unaware of the contents of the Interrogation Statement at the time, he later learned that the Interrogation Statement said that his "true and correct name is Yasin Mohamed Ali ALGHAZALI." This statement is false, as Mr. Omar's true and correct name is not Yasin Mohamed Ali Alghazali, and Mr. Omar did not believe it to be when he signed the statement.

62.     Mr. Omar later learned that the Interrogation Statement also said, among other untrue statements, "I was smuggled to the U.S. by a distant 'uncle' on my mother's side. His name was Rashid Ali ALMADRAHI. I entered the U.S. in 1972 under the assumed/fraudulent identity Mosed Shaye OMAR. I naturalized as a U.S. citizen in 1978 under the assumed/fraudulent identity Mosed Shaye OMAR." These statements were also false. Mr. Omar was not "smuggled" into the United States. Mr. Omar was lawfully admitted into the United States in 1972 based on an immigration visa issued to him by the U.S. Embassy in Sanaa after it determined he was eligible for a visa as Rashid Ali Nagi Almadrahi's adopted son. Mr. Nagi adopted and took care of Mr. Omar at a young age after his parents passed away.

63.   Mr. Omar later learned that the Interrogation Statement also said, among other untrue statements, that the "true and correct" last name of his children is "Alghazali" rather than "Omar." This statement is false, as Mr. Omar's children's last name is "Omar."

64.   On its face, the Interrogation Statement does not identify a translator.

65.   After he signed the statement, Mr. Omar was taken back to the waiting area and told to wait for the consul, who would return his passport. After some time, the consul called Mr. Omar to the window and told him that his passport would not be returned to him because he had another name. Mr. Omar insisted his name was "Mosed Shaye Omar," but the consul closed the window and left.

66.   The consul's refusal to return Mr. Omar's passport upon his request and his statement that Mr. Omar's passport would not be returned to him constituted a *de facto* revocation of Mr. Omar's passport.

67.   A guard escorted Mr. Omar out of the waiting area, and he left the Embassy after 5 p.m. Later that night, based on severe symptoms, Mr. Omar was rushed to the hospital emergency room.

68.   At the time that his passport was confiscated, Mr. Omar was not provided with a written notice explaining why his passport had not been returned to him; nor was he informed of any opportunity to request a hearing or given any instruction on how to return to the United States without his passport. As a result, he could not board his scheduled flight back to the U.S. and he was effectively banished to Yemen.

## MR. OMAR'S REPEATED ATTEMPTS TO OBTAIN AN EXPLANATION
## AND TO RETURN HOME

69.   E-mail is the primary method for U.S. citizens in Yemen to contact the U.S. Embassy in Sana'a. Members of the public cannot enter the Embassy without authorization, as guards who have a list of approved visitors screen all entrants at security checkpoints. Reaching the consul via telephone is extremely difficult. Instead, U.S. citizens are told to e-mail the American Citizen Services desk at SanaaACS@state.gov.

70.    Between January 23, 2013 and December 15, 2013, Mr. Omar sent over half a dozen e-mails to the Embassy inquiring about his daughter's passport application and seeking assistance. His health continued to deteriorate because he could not obtain the treatment and medication that he needs in Yemen. Despite Mr. Omar's many emails asking for help, the Embassy did not provide him any information about how to return home or retrieve his U.S. passport.

71.    In mid-December 2013, Mr. Omar received a phone call telling him to come to the Embassy about his passport. On December 15, 2013, Mr. Omar went to the Embassy and was given a written notice explaining that his U.S. passport had been revoked because "[a]n investigation revealed that you are not Mosed Shaye Omar, born on February 1, 1951. In fact, you are Yasin Mohamed Ali Alghazali, born on February 1, 1951. On January 23, 2013, you signed a sworn statement admitting that your true identity is Yasin Mohamed Ali Alghazali. Because you made a false statement of material fact in your passport application, your passport is revoked pursuant to Section 51.62(a)(2) of Title 22 of the U.S. Code of Federal Regulations." The notice also informed him he could request a hearing within 60 days after receipt of the notice.

72.    Mr. Omar was provided a limited validity passport in early February 2014. He flew back to the United States later that month. The one-time passport was confiscated by U.S. Customs and Border Protection at San Francisco International Airport after he landed.

73.    Mr. Omar's daughter K.O's passport application remains pending.

## STATE DEPARTMENT HEARING ON
## REVOCATION OF MR. OMAR'S PASSPORT

74.    Mr. Omar contacted the State Department to request an administrative hearing concerning the revocation of his U.S. passport within 60 days of receiving a notice of revocation pursuant to 22 C.F.R. § 51.70, *et seq.*

75.    In a letter dated August 6, 2014, Stephanie E. Sharer, Acting Division Chief for Legal Affairs in the Office of Legal Affairs and Law Enforcement Liaison at the U.S. Department of State confirmed prior receipt of Mr. Omar's request for a hearing. The letter further confirmed that the sole purpose of the hearing was to decide "whether or not the Department satisfied the

requirements or conditions of the applicable passport regulations cited as the basis for its adverse action, *not your citizenship status.*"

76.    Mr. Omar retained counsel in connection with the hearing on August 20, 2014. Between August 22, 2014 and September 3, 2014, counsel for Mr. Omar wrote to Ms. Anita Mody, the Attorney Advisor in the Office of Legal Affairs assigned to represent the Department in Mr. Omar's case, and Christine McLean, Division Chief of Legal Affairs for the Department, requesting, among other things, a copy of the Interrogation Statement, which was cited in the revocation notice as the basis for the Department's action. In response, the Department informed counsel for Mr. Omar that it would provide the Interrogation Statement and any other evidence it intended to rely upon in its own written submission, which would be due on the same date as Mr. Omar's submission: September 15, 2014.

77.    Counsel for Mr. Omar objected to this timeline because it would deprive Mr. Omar of the ability to address the legal arguments the State Department intended to present; and because Mr. Omar would not be able to adequately defend himself if he could not contest or respond to the relevant evidence, especially the Interrogation Statement, in his written submission. The Department refused to modify the schedule or to disclose the Interrogation Statement and other relevant documents prior to the due date for Mr. Omar's written submission.

78.    By e-mail dated September 5, 2014, counsel for Mr. Omar contacted Chief McLean requesting certain information or documents in connection with Mr. Omar's hearing, including the name of the officer who interrogated Mr. Omar, any internal investigations or reviews the Department has conducted concerning allegations of coercive interrogations at the U.S. Embassy in Sana'a, and certain portions of the Foreign Affairs Manual. The Department did not provide the requested information.

79.    Through his counsel, Mr. Omar had on August 22, 2014 requested under the Privacy Act and Freedom of Information Act other records related to his interrogation, including notes, video, and audio recordings of the interrogation, and records related to internal investigations, including reviews, censures, or discipline of the State Department employees who interrogated Mr. Omar and others at the Embassy in Sana'a. Mr. Omar's counsel made Chief McLean aware of these

requests but the Department did not provide the information prior to the hearing on his passport revocation.

80.    Mr. Omar filed a written submission with the Department on September 15, 2014.

81.    Mr. Omar's submission argued that Mr. Omar was eligible for a U.S. passport because he is a U.S. citizen; that it was proper for Mr. Omar to obtain a U.S. passport in the name listed on his judicial Certificate of Naturalization; and that, because judicial denaturalization is the sole procedure by which the government may challenge such a certificate, the Department exceeded its statutory and constitutional authority because it effectively based its revocation on questions about the merits of Mr. Omar's Certificate of Naturalization.

82.    Mr. Omar's submission also made evidentiary objections, including (1) that the hearing officer should exclude the statement signed by Mr. Omar at the U.S. embassy because the Fifth Amendment prohibited the Department from relying on involuntary statements; and (2) that, even if the statement was not suppressed, it should be accorded very little weight in contrast to the strong documentary evidence Mr. Omar submitted that his name is "Mosed Shaye Omar": a copy of his U.S. Certificate of Naturalization in the name "Mosed Shaye Omar;" a copy of his California Driver's License in the name "Mosed Shaye Omar;" a copy of his Social Security Card in the name "Mosed Shaye Omar;" a copy of his AFL-CIO Membership Card in the name "Mosed Shaye Omar;" and a copy of his 2010 Federal Income Tax Return in the name "Mosed Shaye Omar." The submission also included a declaration under penalty of perjury providing testimony from Mr. Omar and his daughter Naeema.

83.    Mr. Omar's submission further raised a number of procedural objections, including: (1) that he was required to file his written submission before being apprised of the Department's legal and factual allegations for its revocation action; (2) that he had not been provided a copy of the Interrogation Statement he was forced to sign in advance of his written submission; (3) that he had not been provided with a copy of information he requested from the Department that could aid in his presentation, such as information related to the identity of the interrogating officer and the Department's internal investigation of misconduct at the U.S. Embassy in Sana'a; (4) that

the Department refused to provide Mr. Omar an interpreter at the hearing; and (5) that the hearing process did not appear to be fair, lacked clear guidance on procedure, and lacked neutrality.

84.    The Department also filed its written submission on September 15, 2015. The Department argued, based solely on the Interrogation Statement, that "Yasin Mohamed Ali Alghazali and Mosed Shaye Omar are the same person, and that the person's true identity is Yasin Mohamed Ali Alghazali . . ." and that "Mr. Alghazali therefore obtained U.S. passport number [redacted] fraudulently because he applied for a U.S. passport as Mosed Shaye Omar, . . . a false identity." Quoting the Interrogation Statement, the Department's submission also argued that "he entered the U.S. 'under the assumed/fraudulent name Mosed Shaye Omar,'" making clear its allegations concerning his name were made within the context of suspicions about the manner in which he immigrated to the United States. The Department's exhibits were limited to a copy of the Interrogation Statement; a copy of the Notice of Revocation; and a copy of Mr. Omar's 2007 passport application.  The Department did not present any exhibits, other than the Interrogation Statement, to corroborate that the name "Yasin Mohamed Ali Alghazali" existed, let alone that it belonged to Mr. Omar or that he had ever used it.

85.    An administrative hearing was convened at the Department of State, Office of Passport Services on September 22, 2014. Bennett S. Fellows, Division Chief of the Office of Adjudication, served as the hearing officer. Mr. Omar's case was presented by his counsel via videolink from the Passport Agency in San Francisco. Mr. Omar offered his testimony and his daughter Naeema's testimony via written declaration signed under penalty of perjury; the Department made no objection. The Department presented no witnesses or declarations to rebut Mr. Omar's testimony concerning the circumstances of his interrogation on January 23, 2013.

86.    At the hearing, counsel for Mr. Omar argued the Department was required to prove Mr. Omar was not entitled to a U.S. passport by "clear and convincing evidence." Ms. Mody responded: "It's my understanding that there is no stated burden of proof, and that because this is an informal hearing, there are not very many rules governing the hearing itself . . . ." Officer Fellows agreed with Ms. Mody, and confirmed that he was not holding the Department to any particular

standard of proof. Officer Fellows authorized counsel for Mr. Omar to provide legal authorities for a "clear and convincing evidence" standard in a supplemental submission after the hearing.

87.    At the hearing, Officer Fellows also asked if "the petitioner or counsel [would] be able to provide any evidence, any documentary evidence, that your client used the identity of Mr. Omar before coming to the United States," and specified that "certainly the older the evidence, the closer to your client's birth, the petitioner's birth, the better."  Counsel for Mr. Omar stated that "we felt the certificate of naturalization was sufficient on its own" but that counsel would try to procure such documentation from Yemen after the hearing.

88.    Officer Fellows also asked for any documentation from the hospital visit that Mr. Omar testified occurred after his interrogation at the Embassy to be provided in a supplemental submission.

89.    On October 13, 2014, counsel for Mr. Omar filed a supplemental submission in connection with the September 22 hearing. The supplemental submission provided legal authorities for Mr. Omar's argument at the hearing that the Department was required to sustain the basis for its revocation of Mr. Omar's passport with clear and convincing evidence because it implicates the freedom to travel, an important liberty interest.

90.    Mr. Omar's supplemental submission also argued that the request for pre-immigration documentary evidence affirmed that the revocation was a collateral attack on Mr. Omar's certificate of naturalization, and that, in the short period between the hearing and the due date for the supplementary submission, Mr. Omar had not been able to locate documents that were 40-60 years old, except for a World Health Organization vaccination record. However, he provided testimony from four individuals in Yemen attesting his name was "Mosed Shaye Omar." The supplemental submission noted that the Department itself may be in possession of such documents in connection with Mr. Omar's application for a visa prior to 1972.

91.    Mr. Omar's supplemental submission also provided documentation from the hospital that treated him after his interrogation at the Embassy in January 2013.

92.    By letter dated October 29, 2014, Jonathan M. Rolbin, Director of the Legal Affairs and Law Enforcement Liaison branch of the Department, informed Mr. Omar's counsel that

the Deputy Assistant Secretary for Passport Services, Defendant Brenda Sprague, had approved Hearing Officer Fellows' October 17, 2014 recommendation that the revocation of Mr. Omar's passport be upheld. Pursuant to 22 C.F.R. § 51.74, Defendant Sprague's ratification of Officer Fellows' recommendation is the Department's final decision on the matter.

## STATE DEPARTMENT'S BASIS FOR AFFIRMING
## REVOCATION OF MR. OMAR'S PASSPORT

93. Officer Fellows' conclusion that "the Department acted properly in revoking passport number [redacted] under 22 C.F.R. § 51.62 (a)(2)" was based on numerous errors of law and fact.

94. Officer Fellows erred in concluding that:

> The counsel for Mr. Alghazali [sic] argues that the petitioner's Naturalization Certificate entitles him to a U.S. passport in the name Mosed Shaye Omar because it is proof of citizenship. Even if that is the case, Mr. Alghazali [sic] has failed to establish his identity as Mr. Mosed Shaye Omar.

This was error because, in this case, the question of identity *is* a question of citizenship. The Department did not dispute that Plaintiff is the same individual to whom an immigration visa was issued in 1972 and to whom an oath of naturalization was administered in federal district court in 1978 in the name "Mosed Shaye Omar." In fact, the Department's counsel conceded that Plaintiff is Mosed Shaye Omar when it stated in its written submission that "Yasin Mohamed Ali Alghazali and Mosed Shaye Omar are the same person." Thus there was no doubt of Mr. Omar's *identity* as the same person who was naturalized in 1978 and was thus a U.S. citizen.

      a. Because there is no question that Mr. Omar is the same person who was issued a Certificate of Naturalization under the name "Moshe Shayed Omar," the issuance of a passport in "the name recorded in the evidence of nationality and identity," 22 C.F.R. § 51.25(a), was proper.

      b. Any determination that, despite holding a valid Certificate of Naturalization under the name "Moshe Shayed Omar," Plaintiff was not entitled to be naturalized and obtain citizenship under that name, would be a challenge to the judicial order naturalizing Plaintiff, and outside the State Department's scope of authority.

c.  To the extent Officer Fellows' decision was based on a finding that the  name
under which Plaintiff immigrated and was naturalized was "assumed/fraudulent,"
that issue was a question touching on the merits of his naturalization and which
may be adjudicated only in a judicial denaturalization proceeding, not an
administrative  hearing.

95.    Officer Fellows erred in characterizing the Interrogation Statement as "compelling
evidence that Mr. Alghazali's true identity is not that of Mosed Shaye Omar." Mr. Omar provided
uncontested written testimony under penalty of perjury demonstrating that the Interrogation
Statement was involuntary and unreliable. In addition, the Interrogation Statement contains absurd
conclusory statements which on their face lack credibility, such as the statements about how he
immigrated to the United States and became a U.S. citizen and about his children's names. Further,
the statement is weak support for the proposition that Mr. Omar agrees his name is not "Mosed
Shaye Omar," because he signed it with his name, "Mosed S. Omar."

96.    Officer Fellows further erred in concluding that "the petitioner has not provided
convincing documentary evidence to the contrary," *i.e.*, that he is Mr. Omar.  Department regulations
state that "[t]he applicant must establish his or her identity by the submission of a previous passport,
other state, local, or federal government officially issued identification with photograph, or other
identifying evidence which may include an affidavit of an identifying witness." 22 C.F.R. §
51.23(b). The record established that Mr. Omar applied for the now-revoked passport with his
expiring passport, a document that met the regulatory criteria. In connection with the hearing, Mr.
Omar provided several additional forms of identification that also meet the regulatory criteria,
including a judicial Certificate of Naturalization, a California driver's license, and an affidavit from
four individuals in Yemen who said they knew Mr. Omar by that name before he immigrated to the
United States. Mr. Omar also submitted other evidence corroborating his identity, including, *inter
alia*, a Social Security card, a federal tax return, an AFL-CIO membership card, and a World Health
Organization immunization sheet that predated Mr. Omar's immigration to the United States and
used the name "Mosed Shaye Omar."

97.     Officer Fellows erred in suggesting that the only "convincing documentary evidence of identity" would have been documentation from "the 20 years [Mr. Omar] lived in Yemen prior to applying for an immigrant visa," in other words, approximately 1951-1971. Such a standard is belied by the Department's own regulations, which establish the sufficiency of other forms of evidence of identity. 22 C.F.R. § 51.23(b). Moreover, it was improper, based on the evidence before him, for Officer Fellows to shift the burden to Mr. Omar to produce foreign identifying documents from over 40 years ago, particularly as the State Department conceded at the hearing that "the situation in Yemen is very dire right now, and it is very difficult to get any documentation." Finally, the request for such documents demonstrates that the Department's inquiry amounted to a collateral attack on Mr. Omar's certificate of naturalization.

98.     Officer Fellows erred in rejecting Mr. Omar's argument that the Interrogation Statement should be excluded as evidence because it was signed involuntarily. As explained in Mr. Omar's pre-hearing submission, the Fifth Amendment requires suppression of an involuntary statement regardless of whether a *Miranda* warning was required. However, Officer Fellows misconstrued this argument and summarily rejected it, determining that "[t]he claim that Mr. Alghazali was due a *Miranda* warning because he was subject to custodial interrogation is unconvincing[.]"  Officer Fellows further erred in concluding that Mr. Omar was not subject to custodial interrogation, as the record established Mr. Omar did not feel free to leave, and in fact was not free to leave, as evidenced by, among other things, the interrogator's instructions and the confiscation of his identity document. The record also established that even if Mr. Omar was not in a custodial interrogation, his statement was not voluntary or the product of a free mind.

99.     Officer Fellows erred in determining "[t]he claim that Mr. Alghazali did not know what he was signing is similarly unconvincing" because "[e]ven for someone who does not read English, the included pictures of various adult men in the statement as well as the capitalized names of many other people who the petitioner would recognize would make it clear the form was not a simple and routine piece of paperwork." However, Officer Fellows conflated the question of whether Mr. Omar comprehended the statement with whether he signed it voluntarily. Officer Fellows failed to consider Mr. Omar's uncontested written testimony under penalty of perjury demonstrating that

the Interrogation Statement was involuntary and unreliable, regardless of whether he would recognize some of its graphic contents or consider the document to be "simple and routine." Furthermore, the pictures of people and capitalized names, even if Mr. Omar saw them, would not necessarily convey that the Interrogation Statement involved a confession about his "true identity."

100.   Officer Fellows' recommendation failed to address Mr. Omar's argument that his passport could not be revoked unless sustained by "clear and convincing evidence." In fact, Officer Fellows did not explicitly set forth or apply any standard of proof for weighing the evidence presented to him at the administrative hearing. This resulted in an improper shifting of the burden of proof onto Mr. Omar to prove a negative; *i.e.*, that his identity was *not* false.

101.   Officer Fellows also erred in concluding that the Department "acted properly" in revoking Mr. Omar's passport. The Department's actions violated the required statutory and regulatory procedures because Mr. Omar was not provided a notice or an opportunity to request a hearing until 11 months after his passport had been confiscated and effectively revoked because the Embassy refused to return his passport upon request. Furthermore, the revocation is inconsistent with the policy behind instructions in the Foreign Affairs Manual, which specify that a passport should be issued even when there are questions about potential naturalization or citizenship fraud unless denaturalization proceedings have been completed.

102.   Even if the Interrogation Statement had been voluntary and true, it would not have changed the fact that Mr. Omar's only legal name is Mosed Shaye Omar.  Even if Mr. Omar has identified with other informal names, the name registered with the government and shown on government-issued identification such as a Certificate of Naturalization is his legal name.

## REVOCATION OF MR. OMAR'S PASSPORT IMPLICATES MISCONDUCT BY STATE DEPARTMENT AND U.S. EMBASSY IN SANA'A

103.   As explained in Mr. Omar's submissions in advance of the administrative hearing, Mr. Omar's treatment at the U.S. Embassy in Sana'a occurred against a backdrop of widespread and similar misconduct by law enforcement and consular officials at the U.S. Embassy in Sana'a between at least January 2012 and December 2013.

104.   This misconduct involved subjecting several other U.S. citizens of Yemeni origin to coercive interrogations, procuring involuntary confessions of pre-naturalization immigration fraud, summarily confiscating U.S. passports without provision of written notice or a prompt opportunity for a hearing, and de facto banishment in Yemen through the denial of documents permitting return travel to the United States.

105.   In January 2014, Al Jazeera America reported:

> [A]nother State Department official familiar with the issue — and who spoke on condition of anonymity — told Al Jazeera that a majority of the passport revocations in Sana'a follow a similar pattern. "Virtually all of the statements say that the individual naturalized under a false identity," he said. "They appear to be involuntary."

> According to the official, an internal investigation determined that the statements those revocations were based on were obtained under "confrontational" circumstances, with individuals alone in an interview room with an investigative officer and an interpreter who, the official said, treated their subjects "aggressively."

> "We're talking about an inherently coercive and intimidating environment, without any independent supervision of the interrogator and his translator," said the official.

See Amel Ahmed, Yemeni-Americans Cry Foul Over Passport Revocations, *Al Jazeera America*, Jan. 21, 2014, available at http://america.aljazeera.com/articles/2014/1/21/yemeniamericanscryfoul overpassportrevocations.html.

106.   Upon information and belief, the Department or its officers and employees in fact conducted an internal review or investigation of interrogations at the U.S. Embassy in Sana'a.

107.   Defendants refused to provide records related to any internal investigations, such as the one referenced in the January 2014 Al Jazeera America article, despite requests from Plaintiff's counsel for such records in advance of and at Plaintiff's hearing.

108.   Al Jazeera America's January 2014 report also discussed another Bay Area man's experience at the U.S. Embassy in Sana'a:

> Unless he signed a form, Hussein recalled the officer telling him he would be imprisoned, his U.S. passport would be confiscated, and his son's application [for a passport] would be denied.

> After a lengthy interrogation . . . Hussein signed the form saying he had obtained his U.S. passport using a false identity. "After being in there for hours, I gave in. I didn't realize what it would lead to," he told Al Jazeera by phone from Yemen.

109. In July 2014, The Guardian reported on another man whose passport was confiscated under similar circumstances in Yemen:

> Khaled says that on the day his passport was taken from him, he was not permitted to leave the embassy until he agreed to sign a document admitting to identity fraud – which he did, and which he contests. The Guardian has obtained a copy of the statement, which is in English, and is typed on US Department of State letterhead.

> "They threatened to revoke my passport and the passport of my son, and they threatened to involve me in cases of terrorism," Khaled said.

> After he left the embassy, Khaled claims its officials refused to answer his emails or phone calls. Without proof of citizenship, he did not know whether he would ever be able to return to the US, and since he was not in California to manage the business he co-owned, it eventually folded.

> He was stranded. Eleven months and a day after his passport was confiscated, Khaled says he received formal notification that his passport had been revoked, and was told he could apply for a limited validity passport, which would allow him to return to the US but not leave again.

*See* Smitha Khorana, *U.S. citizens in Yemen accuse American embassy of confiscating passports*, The Guardian, July 22, 2014, available at http://www.theguardian.com/world/2014/jul/22/yemeni-americans-us-embassy-sanaa-passports.

110. The Guardian's July 2014 report also included an interview with another attorney who said the experience sounded similar to his own clients' experiences:

> Jan Brown, an immigration lawyer in New York City who has many clients within the Yemeni American community, has seen four recent cases of passport revocation, with echoes of Khaled's case. . . . He describes the situation of one client: "He was interrogated, he was told he would be put on a terror list, they tried to get him to confess that passports were obtained fraudulently."

111. The striking similarities of these accounts suggest that the Embassy in Sana'a's actions toward Mr. Omar occurred pursuant to Defendants' policy, or as part of a pattern officially sanctioned by Defendants, to secure false, unreliable, or involuntary confessions of pre-naturalization immigration fraud and then to confiscate and effectively revoke their U.S. passports on that basis.

112. Upon information and belief, between at least January 2012 and December 2013, officials at the U.S. Embassy in Sana'a confiscated U.S. passports belonging to at least several dozen U.S. citizens pursuant to 22 C.F.R. § 51.62(a)(2).

113.   Upon information and belief, these confiscations were based on allegations that the individual's identity of citizenship was a "false" or "fraudulent" identity.

114.   Upon information and belief, officials at the U.S. Embassy in Sana'a failed, at the time of the confiscation, to provide written notice with information about the basis for the confiscation or information about how to request a hearing to at least several dozen U.S. citizens whose passports had been confiscated at the Embassy.

115.   Upon information and belief, officials at the U.S. Embassy in Sana'a failed, at the time of confiscation, to provide at least several dozen U.S. citizens whose passports had been confiscated with travel documents to facilitate their return to the United States.

116.   Upon information and belief, DSS Agent David W. Howell—the agent who interrogated Mr. Omar—obtained a substantial number, if not the majority, of the sworn confessions of immigration and naturalization fraud obtained at the U.S. Embassy in Sana'a in connection with passport revocations between at least January 2012 and December 2013.

117.   Upon information and belief, it is the Department's policy to revoke a U.S. passport if it believes the individual to whom the passport belongs became a naturalized U.S. citizen under a "false" identity, even if that individual possesses a judicial certificate of naturalization in the same allegedly "false" identity which has not been cancelled in a denaturalization proceeding.

118.   Upon information and belief, Defendants were aware of allegations of misconduct at the U.S. Embassy in Sana'a, including a practice of obtaining involuntary statements, deficiencies in the process of issuing written notice and offering opportunities for a hearing to persons whose passports were confiscated.

119.   Despite being aware of these problems, Defendants ratified the misconduct by subsequently upholding the revocation of U.S. passports belonging to affected individuals, including Mr. Omar.

**PLAINTIFF'S CLAIMS**

**COUNT ONE**

Defendants' Interpretation and Application of 8 U.S.C. § 1504 is

Unconstitutional and Exceeds Statutory Authority

(APA, 5 U.S.C. §§ 702, 706(2))

120.   The foregoing allegations are re-alleged and incorporated herein.

121.   Defendants' actions to uphold the revocation of Plaintiff's U.S. passport deprived Plaintiff of a constitutionally protected liberty interest under the Fifth Amendment, the freedom of international travel.

122.   Defendants have a policy and practice of revoking U.S. passports as procured "fraudulently" under 8 U.S.C. § 1504 on the basis of the applicant's reliance on a so-called "false identity" despite: (a) an applicant's presentation of a judicial certificate of naturalization bearing the same name and identifying information as on the applicant's passport application; (b) an undisputed federal court order adjudicating the applicant to be a U.S. citizen; and (c) an undisputed certificate of naturalization issued by a federal court for the applicant's possession and use. Defendants' policy and practice exceeds their statutory authority under 8 U.S.C. § 1504(a). Revocation of a passport under 8 U.S.C. § 1504(a) under such conditions amounts to an impermissible collateral attack on a judicial certificate of naturalization undermining its preclusive effect and directly conflicting with the exclusive provisions set out under 8 U.S.C. § 1451(a) for challenging a judicial order of U.S. citizenship.

123.   Defendants revoked Plaintiff's passport pursuant to this policy and practice. Specifically, Defendants upheld the confiscation and revocation of Plaintiff's U.S. passport pursuant to 8 U.S.C. § 1504(a) on the ground that he "obtained U.S. passport number [redacted] fraudulently because he applied for a U.S. passport in a false identity," that of "Mosed Shaye Omar." But because Defendants presented no evidence that Plaintiff was not the individual naturalized by a federal court in 1978, or that the Certificate of Naturalization presented at the hearing did not actually belong to him or was not issued for his use and possession, Defendants' decision did not rest on a valid question of identity. To the extent it rested on identity, Defendants' decision is irreconcilable with

| Complaint for Declaratory and Injunctive Relief<br>Civil Case No.: | 25 | |

the preclusive effect of a judicial Certificate of Naturalization on questions of citizenship in all contexts. Defendants' application of 8 U.S.C. § 1504(a) to Plaintiff was thus in excess of statutory authority, as Defendants do not have statutory authority to disregard citizenship determinations made by the federal courts.

124.   Defendants' policy, and application of the policy to Plaintiff, is also inconsistent with the Defendant Department of State's internal guidance, which requires its agents and officers to issue U.S. passports to individuals with a valid Certificate of Naturalization. *See* 7 F.A.M. § 1381.2(d)(1) ("Certificates of Naturalization or Citizenship are proof of United States citizenship. Accordingly, an individual remains eligible for a U.S. passport until his/her Certificate of Naturalization or Certificate of Citizenship is revoked by U.S. Citizenship and Immigration Services (USCIS) or a U.S. District court . . . ."); 7 F.A.M. § 1381.2(d)(2) ("The certificate [of citizenship] stands on its own and cannot be questioned"); 7 F.A.M. § 1381.2(d)(3) ("Generally, if an applicant's name hits against an 'N' or 'Q' CLASS reason code [i.e., suspicion of no claim to U.S. citizenship or questionable claim] when the individual presents either a Certificate of Naturalization or Citizenship, you must issue a full validity passport.").

125.   Defendants have not provided a reasoned basis for adopting a policy interpreting 8 U.S.C. § 1504(a) that contradicts the procedures set forth in 8 U.S.C. § 1451(a) and the Foreign Affairs Manual, and undermines the preclusive effect of a judicial certificate of citizenship.

126.   Defendants' unlawful interpretation and application of 8 U.S.C. § 1504(a) caused Plaintiff to suffer prejudicial error.

127.   Defendants lack any lawful authority to permanently deny Plaintiff's freedom of international travel.

128.   Defendants' actions and inactions described herein are arbitrary, capricious, constitute an abuse of discretion, are done without observance of procedure required by law, are contrary to constitutional right, are in excess of statutory jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).

## COUNT TWO

Failure to Apply "Clear and Convincing Evidence" Standard of Proof at Plaintiff's Hearing

(APA, 5 U.S.C. §§ 702, 706(2))

129.   The foregoing allegations are re-alleged and incorporated herein.

130.   The hearing convened by Defendants concerning the revocation of Plaintiff's U.S. passport implicated an important liberty interest, the freedom of international travel under the Fifth Amendment.

131.   Defendants did not apply a "clear and convincing evidence" standard of proof at Plaintiff's hearing, which the United States Supreme Court has determined is required by the Fifth Amendment for adjudications involving a significant deprivation of liberty.

132.   Defendants also violated the Fifth Amendment's due process clause by failing to apply any explicit standard of proof at Plaintiff's passport revocation hearing.

133.   Defendants have not provided a reasoned basis for adopting a standard of proof in revocation proceedings that falls below "clear and convincing evidence," or for failing to adopt any standard at all.

134.   Because of Defendants' failure to apply a "clear and convincing evidence" standard of proof at Plaintiff's hearing, and failure to adopt any explicit standard of proof whatsoever, Plaintiff suffered prejudicial error.

135.   Defendants' actions and inactions described herein are arbitrary, capricious, constitute an abuse of discretion, are done without observance of procedure required by law, are contrary to constitutional right, are in excess of statutory jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2).

## COUNT THREE

Reliance on Involuntary Statement in Violation of Fifth Amendment Due Process Clause

(APA, 5 U.S.C. §§ 702, 706(2))

136.   The foregoing allegations are re-alleged and incorporated herein.

137.   Defendants relied on the January 23, 2013 statement to uphold the revocation of Plaintiff's passport, even though the administrative record established that the statement was

coerced, involuntary, and not the product of a free mind or a free will. In so doing, Defendants violated Plaintiff's Fifth Amendment right against the use of involuntary statements against him.

138.   Because of Defendants' improper reliance on the January 20, 2013 statement, Plaintiff suffered prejudicial error.

139.   Defendants' actions and inactions described herein are arbitrary, capricious, constitute an abuse of discretion, are done without observance of procedure required by law, are contrary to constitutional right, are in excess of statutory jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2).

### COUNT FOUR

Defendants' Failure to Provide Plaintiff with Written Notice or a Prompt Hearing in Violation of

Fifth Amendment Due Process Clause and 8 U.S.C. § 1504

(APA, 5 U.S.C. §§ 702, 706(2))

140.   The foregoing allegations are re-alleged and incorporated herein.

141.   The January 23, 2013 confiscation of Plaintiff's passport by Defendants and their agents deprived Plaintiff of a constitutionally protected liberty interest under the Fifth Amendment, the freedom of international travel; and their refusal to return Mr. Omar's passport to him constituted a revocation of Mr. Omar's passport.

142.   By failing to provide Plaintiff with written notice or an opportunity to contest the deprivation in a hearing for eleven months, Defendants violated the Fifth Amendment's due process clause, which requires the opportunity to be heard at a meaningful time and in a meaningful manner.

143.   By failing to provide Plaintiff with written notice or an opportunity to contest the deprivation in a hearing for eleven months, Defendants also violated Plaintiff's rights under 8 U.S.C. § 1504(a), which together with 22 C.F.R. § 51.65(a) requires Defendants and their agents to provide a written notice explaining the reasons for the revocation of a U.S. passport and offering a prompt post-revocation hearing.

144.   Defendants failed to address these constitutional and statutory violations at the subsequent administrative hearing that was convened to consider, in part, "whether the appropriate procedures were followed in revoking the passport."

145.  Because of Defendants' failure to provide Plaintiff with timely notice or opportunity for a hearing, Plaintiff suffered prejudicial error.

146.  Defendants' actions and inactions described herein are arbitrary, capricious, constitute an abuse of discretion, are done without observance of procedure required by law, are contrary to constitutional right, are in excess of statutory jurisdiction authority or limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2).

## COUNT FIVE

### Defendants' Conclusions Were Not Supported by the Record

### (APA, 5 U.S.C. §§ 702, 706(2))

147.  The foregoing allegations are re-alleged and incorporated herein.

148.  Defendants' conclusions were arbitrary and capricious, based on a clear error of judgment and a failure to consider the relevant factors, counter to the evidence before Defendants, based on factors that Congress did not intend Defendants to consider, and were not based on a rational connection between the facts found and the conclusions made.

149.  Because of Defendants' actions described herein, Plaintiff suffered prejudicial error.

150.  Defendants' actions and inactions described herein are arbitrary, capricious, constitute an abuse of discretion, are done without observance of procedure required by law, are contrary to constitutional right, are in excess of statutory jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2).

## COUNT SIX

### Failure to Apply APA Rules of Adjudication to Passport Revocation Hearing

### (APA, 5 U.S.C. §§ 554, 556, 557, 702, 706(2))

151.  The foregoing allegations are re-alleged and incorporated herein.

152.  A passport revocation hearing is an adjudication that is required to be determined on the record after the opportunity for an agency hearing, within the meaning of 5 U.S.C. § 554(a).

153.  Defendants did not follow the APA rules of adjudication that apply to such hearings at Plaintiff's passport revocation hearing. *See* 5 U.S.C. § 556.

154. Because of Defendants' failure to follow the APA rules of adjudication to Plaintiff's hearing, Plaintiff suffered prejudicial error.

155. Defendants' actions and inactions described herein are arbitrary, capricious, constitute an abuse of discretion, are done without observance of procedure required by law, are contrary to constitutional right, are in excess of statutory jurisdiction, authority, or limitations, and are otherwise not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1. An Order holding unlawful and setting aside Defendants' decision to uphold the revocation of Plaintiff's passport;

2. An Order requiring Defendants to reinstate Plaintiff's passport and return it to him;

3. A judgment declaring that Defendants' policies, practices, acts, and omissions described herein violated Plaintiff's rights under the United States Constitution, the APA, and 8 U.S.C. § 1504, such policies, practices, and acts including, but not limited to:

    a. Reliance on Plaintiff's involuntary statement in violation of his Fifth Amendment rights;

    b. Failure to abide by a "clear and convincing" standard of proof at Plaintiff's passport revocation hearing;

    c. Indefinitely or permanently depriving Plaintiff of his Fifth Amendment freedom of international travel;

    d. Failure to afford Plaintiff written notice or a prompt opportunity for a hearing after revoking his passport, in violation of the Fifth Amendment and 8 U.S.C. § 1504; and

    e. Failing to give proper consideration to his court-issued Certificate of Naturalization;

4. A judgment declaring that Defendants and their agents must accept a Certificate of Naturalization issued by a federal court and that is not void on its face as conclusive proof of an applicant's citizenship absent any credible evidence that the applicant is not the same person to whom

the Certificate of Naturalization was issued and for whose use the certificate was intended, and that failure to do so is unlawful and in excess of statutory authority;

5. A judgment declaring that when Defendants or their agents confiscate a U.S. Citizen's passport on suspicion that it was obtained fraudulently, illegally or erroneously under 8 U.S.C. § 1504(a), the confiscation constitutes a deprivation of liberty under the Fifth Amendment immediately triggering due process requirements, and that failure to afford due process is unlawful, in excess of statutory authority, and unconstitutional;

6. A judgment declaring that 8 U.S.C. § 1504(a) does not authorize Defendants or their agents to cancel a United States passport based on their determination that the passport was illegally, fraudulently, or erroneously obtained, when the basis for the determination is Defendants' opinion that the individual applied for the passport in a "false identity," even though the name used was consistent with a judicial Certificate of Naturalization issued to and intended for the use of the applicant—except where Defendants challenge the authenticity of the Certificate of Naturalization itself;

7. A judgment declaring that, after a hearing convened pursuant to 21 C.F.R. § 51.70 *et seq.*, Defendants may only affirm a passport revocation if the revocation is supported by clear and convincing evidence presented at the hearing, because a passport revocation involves a significant deprivation of liberty;

8. A judgment declaring that Defendants must conduct passport revocation hearings in accordance with the Administrative Procedure Act rules of formal adjudication, as set forth in 5 U.S.C. § 554 *et seq.*;

9. Plaintiff's reasonable costs and attorneys' fees pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and/or any other applicable statute or regulation; and

1    10. Any and all other relief as this court may deem just and proper.

2    DATED: April 20, 2015                          Respectfully submitted,

3                                                   By:    /s/ Wendy L. Feng

4                                                   Yaman Salahi (Bar No. 288752)
                                                    Nasrina Bargzie (Bar No. 238917)
5                                                   ASIAN AMERICANS ADVANCING JUSTICE—
                                                    ASIAN LAW CAUCUS
6                                                   55 Columbus Ave.
                                                    San Francisco, California 94111-2101
7                                                   Telephone: + 1 (415) 848-7711
                                                    Facsimile: + 1 (415) 896-1702
8                                                   Email: yamans@advancingjustice-alc.org;
                                                    nasrinab@advancingjustice-alc.org
9
                                                    Wendy L. Feng (Bar No. 200813)
10                                                  Joanne Sum-Ping (Bar No. 296552)
                                                    COVINGTON & BURLING LLP
11                                                  One Front Street, 35th Floor
                                                    San Francisco, California 94111-5356
12                                                  Telephone: + 1 (415) 591-6000
                                                    Facsimile: + 1 (415) 591-6091
13                                                  Email: wfeng@cov.com; jsumping@cov.com

14                                                  *Attorneys for Plaintiff Mosed Shaye Omar*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| Complaint for Declaratory and Injunctive Relief | 32 | |
| Civil Case No.: | | |