UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOSED SHAYE OMAR,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>JOHN KERRY, et al.,<br><br>　　　　　Defendants. | Case No. 15-cv-01760-JSC<br><br>**ORDER RE: MOTION FOR PRELIMINARY INJUNCTION**<br><br>Re: Dkt. No. 14 |

Plaintiff Mosed Shaye Omar contends that Defendants the United States Department of State, John Kerry as the Secretary of State, Brenda Sprague as the Deputy Assistant Secretary of Passport Services, and Michele Bond as the Acting Assistant Secretary for Consular Affairs, (collectively "Defendants" or "the government"), illegally revoked his passport following his interrogation and detention at the U.S. Embassy in Sana'a, Yemen. Although Plaintiff was subsequently provided a temporary passport which allowed him to return to the United States 13 months later, that temporary passport was confiscated by U.S. Customs and Border Protection when he landed in the United States. Plaintiff now moves for a preliminary injunction for return of his passport so that he can travel to Yemen to visit his minor daughter and to help her obtain a U.S. passport. (Dkt. No. 14.) Having considered the parties' submissions and having had the benefit of oral argument on September 8, 2015, as well as supplemental submissions regarding irreparable harm, the Court GRANTS Plaintiff's motion for a preliminary injunction.[1] Plaintiff

---

[1] Both parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 12 & 13.)

has shown a likelihood of success and serious legal issues regarding his challenge to Defendants' revocation of his passport and the balance of hardships weighs strongly in his favor. Given his precarious health and the volatile situation in Yemen, he will likely be irreparably harmed if the United States government continues to refuse to allow him to visit his daughter.

## BACKGROUND

Plaintiff was born in Yemen in 1951, but immigrated to the United States in 1972 through his uncle who adopted him following the death of Plaintiff's parents. (Dkt. No. 14-7 at ¶¶ 1-2 (Declaration of Mosed Shaye Omar).) Plaintiff became a United States naturalized citizen on April 10, 1978. (*Id*. at ¶ 3; Dkt. No. 14-8 (Certificate of Naturalization).)

In July 2012, Plaintiff traveled to Yemen to assist his youngest daughter K.O. in obtaining a U.S. Passport. (Dkt. No. 14-7 at ¶ 4.) He attended an interview at the U.S. Embassy in Sana'a in August 2012, but did not hear anything regarding the status of the application for several months during which time he remained in Yemen. (*Id*. at ¶¶ 4-5.) Plaintiff is a diabetic and has high blood pressure, and he takes several medications for these conditions, medications which he could not obtain in Yemen. (*Id*. at ¶ 1.) By December 2012, Plaintiff had run out of medication and his health had deteriorated. (*Id*. at ¶ 5.) He therefore contacted the U.S. Embassy to follow up on the status of the application and advised officials that he intended to return to the United States for health reasons. (*Id*. at ¶ 6.) He purchased a return flight for late January 2013. (*Id*.)

A few days before he was due to depart, Plaintiff received a call from the U.S. Embassy regarding his daughter's passport and requesting that he come to the Embassy. (*Id*. at ¶ 7.) Upon arriving at the Embassy early the next morning, Plaintiff was asked by a consular officer to provide his passport, which he did. (*Id*. at ¶ 8.) Shortly thereafter, he was taken from the waiting room to another "more secure area" and another building with armed and uniformed U.S. military personnel. (*Id*. at ¶ 9.) To enter the second building, he was escorted through two locked doors which required a special code to open. (*Id*.) Plaintiff was then escorted into an interrogation room with two Americans and an interpreter. (*Id*. at ¶ 11.) Plaintiff had difficulty understanding the interpreter given his dialect, and at times, he could not tell if the interpreter was one of the interrogators. (*Id*. at ¶ 12.) He was not advised of his right to remain silent or his right to consult

an attorney, nor did he know he had the right to remain silent or to leave and consult with an attorney. (*Id*. at ¶¶ 13-14.) Plaintiff believed he had to participate in the interview to obtain his daughter's passport and his own. (*Id*. at ¶ 15.) He was questioned for an hour regarding his parents and other family members and then he was returned to the general waiting room and told to wait. (*Id*. at ¶ 18.) He did not feel he could leave without permission and the Embassy officials had his passport which he needed for his flight home in a few days. (*Id*.)

After about an hour and half of waiting, he was returned to the interrogation room where he was questioned for another hour. (*Id*. at ¶¶ 19, 21.) During this time, he began to feel sick and weak as he had not had any food or water, and he did not have his medication with him. (*Id*. at ¶ 20.) His vision also started to blur which is a symptom of his diabetes. (*Id*. at ¶ 21.) After an hour of questioning, Plaintiff was again escorted back to the waiting room and told to wait. (*Id*. at ¶ 21.) He was unable to contact his family or friends because his cell phone had been taken and there were no phones for public use. (*Id*. at ¶ 22.) After several hours of waiting, everyone started leaving the Embassy and at 4:00 p.m. he was "feel[ing] desperate and very afraid" so he told the guard he would do anything to get his passport back and be allowed to leave. (*Id*. at ¶ 24.)

Plaintiff was then escorted back to the interrogation room by two individuals, because his vision had become so blurry he could not tell if it was the same two individuals as before or different individuals. (*Id*. at ¶¶ 24-25.) He was handed a piece of paper and told to sign it to get his passport returned. (*Id*. at ¶ 26.) Plaintiff could not read the paper because his vision was so blurry and the interpreter did not read the document to him or tell him what the document was. (*Id*. at ¶ 27.) After he signed it, he was returned to the waiting room and after half an hour he was told that he could not get his passport back because he had another name. (*Id*. at ¶ 28.) Plaintiff was not told that the document he signed was a statement admitting that he had used a false name and committed various other acts, nor was he advised as to why his passport had been confiscated or how he could get it back. (*Id*. at ¶¶ 29-30.) Plaintiff was thereafter escorted out of the waiting room and as a result of the stress and lack of food, water, or medication, he had to be taken to see a doctor that night. (*Id*. at ¶¶ 31, 33; Dkt. No. 14-31 at 4.)

Plaintiff missed his flight home because he did not have a passport. (Dkt. No. 14-7 at ¶

3

35.)   Although he repeatedly contacted the Embassy, he was unable to discover anything about his passport until 11 months later, in December 2013, when he received a call from the Embassy advising him to come in.  (*Id*. at ¶¶ 38-39.)   When he visited the Embassy on December 15, 2013, he was given a letter which stated that his passport had been revoked pursuant to 22 C.F.R. § 51.62(a)(2) based on his "sworn statement admitting that [his] true identity is Yasin Mohamed Ali Alghazali" which meant that he made a "false statement of material fact" in his passport application under the name Mosed Shaye Omar.  (*Id*. at ¶ 39; Dkt. No. 14-4 at 2[2] (Dec. 15, 2013 letter).)  The letter also advised Plaintiff of his right to a hearing upon written request.  (*Id*. at 3.)

In January 2014, Plaintiff contacted the Embassy to advise that his health condition had become dire and he needed to return to the United States for treatment.  (Dkt. No. 14-7 at ¶ 40.)  In February, he was granted a temporary passport and he returned home on February 21, 2014.  (*Id*. at ¶¶ 41-42.)  His temporary passport was confiscated by U.S. Customs and Border Protection when he landed at San Francisco International Airport.  (*Id*. at ¶ 41.)  About two weeks after he returned home, he had a heart attack and had a stent placed in his heart.  (*Id*. at ¶ 42; Dkt. No. 14-38 at ¶ 2.)

Plaintiff sought administrative review of his passport revocation pursuant to the provisions set forth in the December 15, 2013 letter.  On August 6, 2014, he was notified that his passport revocation hearing was set for September 22, 2014.  (Dkt. No. 14-21 at 2 (Aug. 6, 2014 letter).)  The letter advised that the "only issue for consideration and decision will be whether or not the Department satisfied the requirements or conditions of the applicable passport regulations cited as the basis for its adverse action, not your citizenship status."  (*Id*.)  Plaintiff subsequently obtained counsel who attempted to postpone the hearing to allow additional time to prepare, but counsel was unable to obtain such a postponement, although the government granted a seven-day extension of the briefing schedule.  (Dkt. Nos. 14-16; 14-17.)

On September 22, 2014, Plaintiff and his counsel appeared for the hearing via video link with Bennett S. Fellows, Division Chief of the Office of Adjudication, serving as the hearing

---

[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

4

officer.  (Dkt. Nos. 14-1 at ¶ 31 (Declaration of Counsel Yaman Salahi); 14-36 (Transcript of Sept. 22, 2014 hearing).)  A month later, Plaintiff was advised that Deputy Assistant Secretary Brenda Sprague had approved Hearing Officer Fellows' October 17, 2014 recommendation affirming the revocation of Plaintiff's passport because his use of the name "Mosed Shaye Omar" to obtain a passport constituted a fraud in violation of 22 C.F.R. § 51.62 (a)(2).  (Dkt. No. 14-35 (Oct. 17, 2014 letter).)

Plaintiff filed this civil action on April 20, 2015 seeking return of his passport and a declaration that Defendants violated his right under the Constitution, the Administrative Procedures Act, and 8 U.S.C. § 1504.  (Dkt. No. 1.)  Plaintiff alleges six causes of action under the APA: (1) Defendants interpretation and application of 8 U.S.C. § 1504 is unconstitutional and exceeds their statutory authority; (2) Defendants failed to apply the proper "clear and convincing evidence" standard of proof at his passport revocation hearing; (3) Defendants improperly relied on an involuntary statement obtained in violation of Plaintiff's Fifth Amendment rights to revoke his passport; (4) Defendants failed to timely provide Plaintiff with written notice or a prompt hearing following revocation of his passport in violation of his Fifth Amendment rights; (5) Defendants' actions were arbitrary and capricious; and (6) Defendants failed to comply with APA rules of adjudication with respect to Plaintiff's passport revocation hearing.  (Complaint ¶¶ 120-155.)

On June 24, 2015, Plaintiff filed the now pending motion for preliminary injunction seeking the return of his passport.  (Dkt. No. 14.)  Defendants opposed the motion and at the request of the parties the hearing was rescheduled twice to September 8, 2015.  (Dkt. Nos. 21, 23 & 25.)

**LEGAL STANDARD**

A preliminary injunction is an "extraordinary remedy."  *Winter v. Nat. Res. Defense Council*, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20.  Alternatively, "if a plaintiff can only show that there are serious

1  questions going to the merits—a lesser showing than likelihood of success on the merits—then a
2  preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's
3  favor, and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709
4  F.3d 1281, 1291 (9th Cir. 2013) (internal citation and quotation marks omitted).   In this respect,
5  the Ninth Circuit employs a sliding scale approach to these factors, wherein "the elements of the
6  preliminary injunction test are balanced so that a stronger showing of one element may offset a
7  weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th
8  Cir. 2011).  A "serious question" is one on which the movant "has a fair chance of success on the
9  merits."  *Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984)
10 (internal citation omitted).

## DISCUSSION

### A. Likelihood Success on the Merits/Serious Legal Questions

Plaintiff contends that he is entitled to a preliminary injunction because he can demonstrate a likelihood of success on the following issues: (1) Defendants acted arbitrarily and capriciously and in violation of the law by relying on Plaintiff's involuntary statement to revoke his passport; (2) Defendants violated Plaintiff's due process rights when they revoked his passport without applying the correct standard of proof, and (3) because the revocation amounts to a collateral attack on Plaintiff's citizenship, it exceeded Defendants' authority.

#### 1) Use of the Allegedly Involuntary Statement

Plaintiff contends that his due process rights were violated when the State Department revoked his passport based on the involuntary statement he provided at the U.S. Embassy in Sana'a on January 23, 2013.  In *Bong Youn Choy v. Barber*, 279 F.2d 642 (9th Cir. 1960), the Ninth Circuit concluded that the petitioner's statement was involuntary based on his unchallenged testimony that the statement was made after authorities made threats of criminal prosecution and deportation over a period of seven hours, which stretched into the early morning.  279 F.2d at 644–47.  The court concluded that "[a] statement obtained by the government by inducing fear through official threats of prosecution is not voluntarily given." *Id*. at 647.  As a result, the statement could "no more be used as a basis for deportation than for conviction of a crime," and it

United States District Court
Northern District of California

1 therefore violated due process to admit the statement into the petitioner's administrative
2 deportation proceeding. *Id.* Likewise, in *Navia-Duran v. Immigration & Naturalization Serv.*,
3 568 F.2d 803 (1st Cir. 1977), the petitioner's statement was found involuntary where she was
4 "[i]solated from her friends, inexperienced in American justice, taken from her home to a strange
5 office late at night" and told by the immigration agent that she had "no choice." 568 F.2d at 810.

6       The undisputed record here compels a finding that Plaintiff is at least likely to succeed on
7 his claim that his statement too was involuntary. The statement was made after he had been
8 detained at the Embassy for more than nine hours without food, water, or medication that he needs
9 for his serious medical conditions; no one advised him of his right to leave, to be silent, or his
10 right to consult an attorney; he did not read the statement and no one read the statement to him,
11 and, to the contrary, it was affirmatively misrepresented to him that by signing the document his
12 passport would be returned—the passport he required to return to the United States to obtain his
13 needed medical care. Even if he had been given the opportunity to read the document, he would
14 not have understood it as his English is not very good and his eyes were blurry and he was not
15 feeling well due the deprivation of food, water, and medicine. He signed the statement without
16 knowing its contents because he believed that was the only way to get his passport back. (Dkt. No.
17 14-7 at ¶¶ 8, 12, 15, 18, 20, 21, 23, 24, 26-27.)

18       Based on these uncontested allegations, Plaintiff has demonstrated a likelihood of success
19 as to his contention that the statement was involuntary. Indeed, the finding of involuntariness is in
20 certain respects stronger here than in *Choy*. In *Choy*, there was no dispute that the petitioner knew
21 what he was admitting, only whether he was coerced into making the confession. 279 F.2d at 647
22 (concluding that petitioner's statement was involuntary where it was the result of a "heavy-handed
23 threat [that] was followed by sleepless hours for [petitioner], and finally, weary and distressed, he
24 sought to appease his official accusers by making the statement containing the admissions.").
25 Here, in contrast, the record is undisputed that Plaintiff was not even aware of the contents of the
26 statement at the time he signed it and he did not become aware of its contents until the government
27 belatedly disclosed the statement to him months later at his administrative hearing.
28       Defendants counter with a perfunctory declaration that the involuntariness of the

7

1  statement: "is not supported by the evidence; and in fact, all evidence suggests that his statement
2  was voluntary, knowing, and accurate. *See generally* Attachment 5 to Plaintiff's motion for a
3  preliminary injunction." (Dkt. No. 23 at 16:7-9.)  Attachment 5, however, is merely the statement
4  itself—hardly evidence that the statement was voluntary and knowing.  (Dkt. No. 14-5.)
5  Moreover, Plaintiff signed the statement as "Mosed Shaye Omar."  It is puzzling, to say the least,
6  why someone who understood that he was signing a confession that his true name is something
7  other than Omar would sign the so-called confession under the allegedly false name Omar.  Thus,
8  this signature is consistent with Plaintiff's testimony and further supports a finding that the
9  statement was unknowing and involuntary. The government's written opposition does not address
10 this anomaly, nor does it even discuss *Choy*, let alone distinguish *Choy* from the uncontested facts
11 of this case.

The Hearing Officer based his revocation decision exclusively on the January 23 statement.[3] (Dkt. No. 14-35.)  Since, as explained above, the uncontested facts show that the statement was unknowing and involuntary, Plaintiff's due process rights were violated when it served as the predicate for his passport revocation.  *See Choy*, 279 F.3d at 647.  Accordingly, Plaintiff has demonstrated a likelihood of success, or at a minimum, serious legal issues regarding his claim that the revocation should be set aside under 5 U.S.C. § 706(2)(B) (authorizing the court to set aside agency actions that are contrary to a constitutional right).[4]

**2) The Standard of Proof**

Plaintiff also contends that his due process rights were violated because Defendants failed to apply the correct standard of proof to his passport revocation.  "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to

---

[3] *See also* Dkt. N. 14-36 (Hearing Transcript) at 47:4-12 (Hearing Officer Fellows: "Ms. Mody, does the Department have any other documentary evidence other than the signed statement to show that Mr. Omar is actually someone else or is the Department conceding that this, the man here, is Mr. Omar but it's not his birth identity?"  Ms. Mody: "So the basis for the Department's revocation was based solely on the sworn statement that it was provided.")

[4] Plaintiff has also offered uncontested evidence that the statement was not true. *See, e.g.*, Dkt No. 14-33 (sworn affidavits from four individuals who attest that they knew the Plaintiff (identified via photograph) by the name Mosed Shaye Omar, and no other, prior to his entry to the United States).

8

instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Addington v. Texas*, 441 U.S. 418, 423 (1979) (internal citation and quotation marks omitted). "At one end of the spectrum is the typical civil case involving a monetary dispute between private parties" wherein the "plaintiff's burden of proof is a mere preponderance of the evidence [and] [t]he litigants [] share the risk of error in roughly equal fashion." *Id*. At the other end of the spectrum, in a criminal case, the beyond a reasonable doubt standard applies because "the interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment." *Id*. An intermediate "clear" and "convincing" standard applies where the interests at stake "are deemed to be more substantial than mere loss of money" or where "particularly important individual interests" are at stake. *Id*. at 424. Plaintiff here urges that the proper standard of proof for a passport revocation is clear and convincing evidence whereas Defendants contend that the standard is a preponderance of evidence.

Clear and convincing evidence requires evidence that could "place in the ultimate factfinder an abiding conviction that the truth of its factual contentions are highly probable." *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (internal citation and quotation marks omitted); *see also United States v. Yi*, 704 F.3d 800, 806 (9th Cir. 2013) ("Clear and convincing evidence creates a conviction that the factual contention is highly probable."). In contrast, evidence satisfies the preponderance of the evidence standard if it is "reliable and thoroughly tested." *United States v. Mezas de Jesus*, 217 F.3d 638, 644 (9th Cir. 2000) (internal citation and quotation marks omitted).

While the preponderance of evidence standard generally applies in ordinary civil cases, the Supreme Court has applied the clear and convincing evidence standard when certain fundamental rights are at stake. *See, e.g.*, *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 286 (1990) (cessation of life support); *Santosky v. Kramer*, 455 U.S. 745, 760-70 (1982) (termination of parental right); *Addington*, 441 U.S. at 433 (civil commitment); *Woodby v. Immigration & Naturalization Serv*., 385 U.S. 276, 286 (1966) (deportation); *Chaunt v. United*

9

1   *States*, 364 U.S. 350, 353 (1960) (denaturalization).  Plaintiff, relying on the Supreme Court's
2   decision in *Kent v. Dulles*, 357 U.S. 116 (1958), contends that an individual's right to travel
3   internationally is likewise a fundamental right.  In *Kent*, the Supreme Court held that Congress had
4   not authorized the Secretary of State to inquire of passport applicants as to any affiliation with the
5   Communist Party finding that "[t]he right to travel is a part of the 'liberty' of which the citizen
6   cannot be deprived without the due process of law under the Fifth Amendment." *Id*. at 125.  In so
7   holding, the Court observed that "[t]ravel abroad, like travel within the country, may be necessary
8   for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or
9   wears, or reads. Freedom of movement is basic in our scheme of values." *Id*.

Defendants counter that the "right to travel" was limited by the Supreme Court's subsequent decision in *Haig v. Agee*, 453 U.S. 280, 306 (1981), which addressed the State Department's authority to revoke a rogue CIA agent's passport.  There, the Court found that "[r]evocation of a passport undeniably curtails travel, but the freedom to travel abroad with a 'letter of introduction' in the form of a passport issued by the sovereign is subordinate to national security and foreign policy considerations; as such, it is subject to reasonable governmental regulation." *Id*. at 306.  "The Court has made it plain that the freedom to travel outside the United States must be distinguished from the right to travel within the United States." *Id.*  Indeed, while "[t]he constitutional right of interstate travel is virtually unqualified," "the 'right' of international travel has been considered to be no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment." *Califano v. Aznavorian*, 439 U.S. 170, 176 (1978). "Thus, legislation which is said to infringe the freedom to travel abroad is not to be judged by the same standard applied to laws that penalize the right of interstate travel, such as durational residency requirements imposed by the States." *Id.* at 176-77.

However, neither *Agee* nor *Aznavorian* can be said to have substantively diminished the fundamental nature of the right to travel.  The *Agee* Court explicitly noted that it had considered a different question in *Kent*; namely, whether the Secretary of State could deny a passport based on someone's political beliefs and not "whether the Executive had the power to revoke the passport of an individual whose conduct is damaging the national security and foreign policy of the United

States." *Agee*, 453 U.S. at 304; *see also Regan v. Wald*, 468 U.S. 222, 241 (1984) (distinguishing *Kent* from cases addressing national security issues noting that the "the Fifth Amendment right to travel, standing alone, [was] insufficient to overcome the foreign policy justifications supporting [a] restriction" on all travel to Cuba). The government undoubtedly has greater leeway in enacting regulations aimed at national security. Indeed, the salient inquiry in *Agee* was the level of judicial scrutiny, not, as here, the level of proof required. Moreover, recent cases emphasize that the right to travel—including the right to international travel—remains a firmly entrenched right of an American citizen. *See Vartelas v. Holder*, 132 S. Ct. 1479, 1488 (2012) ("Loss of the ability to travel abroad is itself a harsh penalty, made all the more devastating if it means enduring separation from close family members living abroad."); *Eunique v. Powell*, 302 F.3d 971, 973 (9th Cir. 2002) ("It is undoubtedly true that there is a constitutional right to international travel.").

The question then is what standard of proof is required when that right is implicated. While neither party points to a case defining the standard of proof applicable to a passport revocation or even a travel restriction generally, Plaintiff compellingly posits that the government's interest in preventing the issuance of false passports is at least as great as the government's interest in preventing undocumented individuals who have no legal status in the United States from remaining here and the Supreme Court has held that clear and convincing burden applies to those proceedings. *See Woodby*, 385 U.S. at 285. ("[t]his Court has not closed its eyes to the drastic deprivations that may follow when a resident of this country is compelled by our Government to forsake all the bonds formed here and go to a foreign land where he often has no contemporary identification."). This is particularly true where, as here, the practical effect of the revocation of Plaintiff's passport was to prevent him from returning home to the United States for *13 months*. The revocation of Plaintiff's passport while he was in Yemen left him stranded there and "thus visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom." *Flores-Chavez v. Ashcroft*, 362 F.3d 1150, 1161 (9th Cir. 2004) (setting aside an in absentia deportation order where the INS failed to provide proper notice of the deportation hearing). Thus, just as the Fifth Amendment requires the government to prove an undocumented individual's unlawful status by clear and convincing evidence, it arguably

11

should protect citizens from denial of the right to international travel (including international travel home to the United States) by requiring a showing of clear and convincing evidence. *See Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to [] constitutional protection" under the Fifth Amendment).

It is, however, unnecessary to finally decide this legal issue at this stage as Plaintiff has demonstrated a likelihood of success under either standard of proof because Defendants failed to apply any particular level of proof to the revocation hearing. Even if Defendants had applied the preponderance of evidence standard, the evidence relied upon lacked sufficient indicia of reliability—a hallmark of the preponderance of the evidence standard.

First, the hearing transcript reflects that the Hearing Officer did not apply any standard of proof.

> [GOVERNMENT COUNSEL] MS. MODY: It's my understanding that there is no stated burden of proof, and that because this is an informal hearing, there are not very many rules governing the hearing itself, particularly because the hearing officer makes a recommendation to the Deputy Assistance Secretary to make a final determination.
>
> COMMISSIONER FELLOWS: As Ms. Mody said, as an administrative hearing and as I sort of laid out at the start, it's very informal. So the same burdens that you might face in a courtroom don't necessarily apply in this hearing.
>
> And as Ms. Mody said, after the hearing, I will make a recommendation to the Deputy Assistant Secretary for Passport Services, and she will consider all the relevant submissions, as well as my opinion.

(Dkt. No. 14-36 at 43:5-21.) Nor does it appear that Defendant Sprague, Deputy Assistant Secretary for Passport Services, applied a particular standard of proof to her review as she merely signed her name in the approved line on the Hearing Officer's recommendation. Plaintiff has thus demonstrated a likelihood of success on the merits of his claim that no particular evidentiary standard was applied, let alone a clear and convincing standard.

Second, Defendants' decision cannot withstand scrutiny even under the more lenient preponderance of the evidence standard; under that standard the factfinder is required to find that the evidence is "reliable and thoroughly tested." *Mezas de Jesus*, 217 F.3d at 644. Here,

Defendants' decision rested entirely on the January 23 statement—"the basis for the Department's revocation was based solely on the sworn statement," *see* Dkt. No. 14-36 at 47:11-12—and that statement, as discussed above, lacks indicia of reliability given the circumstances under which it was made. Defendants make no argument to the contrary, and instead, just assert in conclusory fashion that the preponderance of evidence standard was applied and satisfied here.

In resting his decision solely on the sworn statement, the Hearing Officer faulted Plaintiff for failing to provide evidence from individuals within Yemen who could vouch for his identity prior to his immigration to the United States—over 40 years ago. (Dkt. No. 14-35 at 6 "petitioner was provided with an opportunity to submit additional documentary evidence of identity after the conclusion of his hearing and was unable to produce a single document from the 20 years he lived in Yemen prior to applying for an immigrant visa. The one document provided was created immediately before Mr. Alghazali came to the United States.")[5] However, even the government agrees that it bore the burden to sustain the revocation by a preponderance of the evidence—Plaintiff did not bear any burden. Further, as government counsel noted at the administrative hearing, obtaining additional evidence from inside Yemen was very difficult because "the

---

[5] This is particularly troubling given the unreasonable timeframe Plaintiff was given to obtain this information. At the hearing, the Hearing Officer asked Plaintiff's counsel to provide additional documentary evidence supporting Plaintiff's contention that he used the name Mosed Shaye Omar in Yemen prior to coming to the United States. (Dkt. No. 14-36 at 49:12-16.) Counsel agreed to do so and asked for a timeframe. The Hearing Officer vaguely responded "I will refer it as soon as possible. And I will relay that date through Division Chief McLean to you and she'll reach out to you with that information." (*Id*. at 53:8-11.) Then, in an email sent that same day, the Hearing Officer advised Ms. McClean that he requested that this additional documentary evidence be submitted by October 10—18 days later. (Dkt. No. 14-30 at 2.) The due date was not communicated to Plaintiff's counsel until two days later as Ms. McClean was out of the office. (*Id*.) Because of the delay, Plaintiff's counsel was given **one** extra business day, until October 14, to submit the additional documentation—October 11 and 12 were a weekend, and October 13 was Columbus Day, a legal holiday. (*Id*.) Plaintiff thus had less than 23 days to obtain documents *from Yemen*, have them translated, and provide them to the hearing officer before he rendered his decision. Despite this abbreviated timeframe, Plaintiff's counsel obtained a copy of Mr. Omar's vaccination record from Yemen from 1972 and the sworn statements of four individuals from Yemen who attested that "they know the person whose photo appears above and that his name is Mosed Shaye Omar, and that they know him by this name prior to this entry to the United States of America, and that they do not know of any other name for him." (Dkt. Nos. 14-32, 14-33.) The Hearing Officer nonetheless faulted Plaintiff for not obtaining additional documentary evidence of identity and in doing so wholly failed to discuss the sworn statements of the four individuals, and discounted the immunization record as "created immediately before [he] came to the United States." (Dkt. No. 14-35 at 6.)

situation in Yemen is very dire right now, and it is very difficult to get any documentation." (Dkt. No. 14-36 at 47:13-15.) The Hearing Officer thus improperly shifted the burden of proof and faulted Plaintiff for not obtaining documents that the government itself acknowledged were nearly impossible to obtain.

Plaintiff has thus demonstrated a likelihood of success, or least serious issues, on his claim that Defendants violated his due process rights by revoking his passport without applying the correct evidentiary standard of proof.

### 3) The Revocation as a Collateral Attack on Citizenship

Plaintiff also contends that the revocation must be set aside because Defendants' action exceeded their statutory authority under 8 U.S.C. § 1504(a). In particular, because Plaintiff used his judicial Certificate of Naturalization as the basis for establishing his identity and citizenship when obtaining his passport, the government's determination that Plaintiff's passport was fraudulent necessarily calls into question the validity of the court's prior order on Plaintiff's judgment of citizenship. Plaintiff argues that such a collateral attack on his citizenship is prohibited. Defendants counter that the question of identity and citizenship are separate inquiries.

8 U.S.C. § 1504(a) authorizes the Secretary of State to cancel a passport "if it appears that such document was illegally, fraudulently, or erroneously obtained from, or was created through illegality or fraud practiced upon, the Secretary." Defendants contend that Plaintiff's passport was obtained fraudulently as it was obtained in a false name because Plaintiff's name is actually Yasin Mohamed Ali Alghazali not Mosed Shaye Omar. Defendants do not appear to dispute that Plaintiff's Certificate of Naturalization, which identifies him as Mosed Shaye Omar, and includes his photograph, was the document Plaintiff used to establish his identity and citizenship for purposes of obtaining his passport. (Dkt. No. 14-8.) The revocation of Plaintiff's passport based on his use of a false identity—when that identity was established by his Certificate of Naturalization—thus calls into question his identity for all purposes including naturalization.

It is not clear, however, that this type of collateral attack is precluded as a matter of law. The cases upon which Plaintiff relies arose in different contexts. *See, e.g.*, *Spratt v. Spratt*, 29 U.S. 393, 408 (1830) (addressing the effect of a naturalization order in the context of a property

14

dispute); *Johannessen v. United States*, 225 U.S. 227, 242 (1912) (upholding legislation which provided for judicial review of an order of naturalization that was alleged to have been obtained through fraud or other illegal contrivance); *Mut. Ben. Life Ins. Co. v. Tisdale*, 91 U.S. 238, 246 (1875) (determining that letters of administration were not admissible as proof of death and citing to the legal effect of a naturalization decision by way of analogy). *Magnuson v. Baker*, 911 F.2d 330 (9th Cir. 1990), is the most on point. There, the Ninth Circuit observed that the Secretary of State can only question the authenticity of a certificate of naturalization and not its veracity, but that statement appears as dicta in a footnote. *Id*. at 333 n.6 ("Because a certificate is conclusive evidence of citizenship, if a holder of a certificate from a naturalization court presented the certificate to the Secretary in order to obtain a passport, the Secretary could not relitigate the citizenship issue. The Secretary could question only the certificate's authenticity, i.e., whether the certificate is a forgery.").

Thus, while the Secretary lacks the authority under Section 1504(a) to make a determination regarding citizenship, it is not clear that this precludes the Secretary from making any determination which might *implicate* citizenship. The Secretary's position, however, places Plaintiff in an untenable situation. The Secretary claims that once presented with the "confession" it had no choice but to revoke the passport; it could not release the passport when it believed it was obtained with a false name. At the same time, however, for the more than two and half years since his passport was revoked, the United States has not filed any action, administrative or otherwise, to challenge Plaintiff's citizenship. Instead, it has made it repeatedly clear that it is not challenging his citizenship and, indeed, if Plaintiff filed an action to reaffirm his citizenship, the government candidly surmised that it might argue that such lawsuit does not present an actual case or controversy because the government does not contest Plaintiff's citizenship. (Dkt. No. 32 at 21-25.) In other words, the government apparently believes it is proper to revoke a United States citizen's passport on the grounds that he is not the person that the United States agreed he was when he obtained his citizenship, but then take no steps to actually challenge the citizenship and to instead leave the citizen in a state of legal purgatory. Such tactics at the very least raise serious questions.

### B. Likelihood of Irreparable Harm

Having concluded that Plaintiff has established a likelihood of success on his claim that his passport was improperly revoked based solely on an unknowing and involuntary statement, and Plaintiff having otherwise raised serious legal issues, the Court next turns to the question of irreparable harm. As a threshold matter, Plaintiff contends that the deprivation of his constitutional right to travel necessarily constitutes an irreparable injury. Plaintiff also argues that because he cannot travel internationally, he cannot visit his 16-year-old daughter who is in Yemen, and she conversely cannot leave to come live with Plaintiff in the United States without a Consular Report of Birth Abroad and a U.S. passport. (Dkt. No. 14-38 (Omar Decl.) at ¶ 4, Dkt. No. 30-2 (Supplemental Omar Decl.) at ¶ 2.) Defendants counter that there is no irreparable harm because the Court can rule on the APA claims efficiently through cross-motions for summary judgment once the administrative record is filed, and Plaintiff can apply for a U.S. passport for his daughter even without having one himself, citing to various regulations.

"It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal citation and questions marks omitted). Here, while the parties dispute the fundamental nature of the right involved, as noted *supra*, there is a constitutional right to international travel. *See Eunique v. Powell*, 302 F.3d 971, 973 (9th Cir. 2002). In the context of other constitutional rights such as the right to speech and freedom of religion, courts generally conclude that abridgment of these rights constitutes an irreparable injury. *See, e.g.*, *Farris v. Seabrook*, 677 F.3d 858, 868 (9th Cir. 2012) (affirming the district court's conclusion that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and that "harm is particularly irreparable where, as here, a plaintiff seeks to engage in political speech, as timing is of the essence in politics and [a] delay of even a day or two may be intolerable."); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006) ("where a movant alleges a violation of the Establishment Clause, this is sufficient, without more, to satisfy the irreparable harm prong for purposes of the preliminary injunction determination."); Fed. Prac. & Proc. Civ. § 2948.1 (The Rutter Guide 2015) ("When an alleged deprivation of a constitutional right is

involved, such as the right to free speech or freedom of religion, most courts hold that no further showing of irreparable injury is necessary."). Likewise, separation from family members can constitute an irreparable injury. *Andreiu v. Ashcroft*, 253 F.3d 477, 484 (9th Cir. 2001) (en banc) ("[o]ther important [irreparable harm] factors include separation from family members, medical needs, and potential economic hardship.")

Thus, there is considerable precedent for the conclusion that abridgment of Plaintiff's constitutional right to travel and separation from his daughter poses an irreparable injury. Further, while the Embassy in Yemen is closed with no sign of reopening soon and U.S. Citizens are urged to defer travel to Yemen given that it is in a state of civil war, *see* Dkt. No. 30-2 at ¶¶ 3-4; *id*. at 5 (U.S. Department of State, Yemen Crisis travel bulletin dated August 21, 2015), at oral argument, the government agreed that there is no legal impediment to Plaintiff travelling to Yemen. (Dkt. No. 32 at 35:19-21.) Indeed, the dangerous situation in Yemen merely highlights the irreparable harm to Plaintiff in not being allowed to be with, or at least attempt to be with, his daughter. Plaintiff thus has demonstrated a likely risk of irreparable harm. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) ("plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.")

### C. Balance of Hardships and Public Interest

The remaining factors—the balance of hardships and the public interest—weigh in Plaintiff's favor. "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir.) *cert. denied*, 134 S. Ct. 2877 (2014). Defendants' only asserted interest here is in protecting the public from having a United States citizen travel under his legal name because the government believes that 30 years ago he applied for citizenship under a false name. And the government has not sought to denaturalize the citizen despite having more than two years to do so. The government's claim of hardship is further undercut by its Foreign Affairs Manual:

> (d) *Questionable* **Certificates of Naturalization and Citizenship**.
> (1) (SBU) By law, 8 U.S.C. 1443(e), Certificates of Naturalization or Citizenship are proof of United States citizenship. Accordingly, an individual remains eligible for a U.S. passport until his/her

17

> Certificate of Naturalization or Certificate of Citizenship is revoked by U.S. Citizenship and Immigration Services (USCIS) or a U.S. District court, or unless he/she is ineligible for passport services for reasons other than non-citizenship.

7 FAM § 1381.2(d) [6] (Dkt. No. 14-20 at 2). Thus, the government's own guidelines provide that the proper course under circumstances similar to those present here is to move to revoke the applicant's Certificate of Naturalization, not to withhold the applicant's passport as was done here. The government has failed to show any hardship whatsoever.

In contrast to the government's lack of hardship, Plaintiff has established that the denial of his passport infringes on his constitutional right to travel and separates him from his daughter. This factor therefore weighs in his favor. The public interest likewise favors return of Plaintiff's passport given that "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002.

## CONCLUSION

The government revoked Plaintiff's passport based solely on a written statement that Plaintiff signed without reading or understanding, and only after he had been deprived of food, water, and medication for hours and was desperate for return of his passport so he could travel to the United States to obtain medical care. Plaintiff has therefore established a likelihood of success on his claim that the revocation violated his right to due process and was therefore arbitrary and capricious. *See Choy*, 279 F.2d at 647. He has also raised at least serious questions as to whether Defendants applied the appropriate standard of review to his passport revocation and whether the revocation is an improper and incomplete collateral challenge to his citizenship. As the balance of hardships and the public interest tip sharply in Plaintiff's favor, his motion for a preliminary injunction is GRANTED. Defendants shall return Plaintiff's passport to him within 10 days of this Order.

The government has filed the certified administrative record and the previously established

---

[6] In its Answer, the government admitted that the above quoted provision was in effect between January 2013 and December 2013. (Dkt. No. 19 ¶ 31.) The government contends that Plaintiff has selectively quoted from the Manual in a way that distorts its meaning, but does not submit any other Manual provisions or explain how the above quoted provision means anything other than what it says.

briefing schedule remains in effect with minor adjustments to allow adequate time for briefing on Defendants' cross-motion for summary judgment as follows:

    Plaintiff's motion for summary judgment is due October 30, 2015.

    Defendants' opposition and cross-motion is due November 13, 2015.

    Plaintiff's reply and opposition to the cross-motion is due November 23, 2015.

    Defendants' reply on their cross-motion is due November 30, 2015.

    The hearing will be December 10, 2015 at 9:00 a.m.

**IT IS SO ORDERED.**

Dated:  October 13, 2015

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge