1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11    MOSED SHAYE OMAR,                     Case No.  15-cv-01760-JSC

                        Plaintiff,
12                                          **ORDER RE: CROSS MOTIONS FOR**
13            v.                            **SUMMARY JUDGMENT**

14    JOHN KERRY, et al.,                   Re: Dkt. Nos. 55, 56

                        Defendants.
15

16

17          This lawsuit presents the question of whether the United States government may revoke a

18   United States citizen's passport based solely on a purported "confession" that the citizen did not

19   write, dictate, read, or have read to him, but did in fact sign.   On the record before the Court, the

20   answer is no.

21          Plaintiff Mosed Shaye Omar, a United States citizen, challenges the revocation of his

22   passport following his interrogation and detention at the U.S. Embassy in Sana'a, Yemen.

23   Plaintiff was stranded in Yemen for 13 months before he was provided written notice of the basis

24   for his passport revocation and granted a temporary passport to return home to the United States.

25   Plaintiff challenges the passport revocation and the constitutionality of the post-revocation

26   proceedings wherein he sought return of his passport.  The Court previously granted Plaintiff's

27   motion for a preliminary injunction and ordered the government to return Plaintiff's passport.

28   The now pending cross-motions for summary judgment followed.  Having considered the parties'

submissions, including their supplemental briefs, and  having had the benefit of oral argument on December 17, 2015, the Court GRANTS Plaintiff's motion for summary judgment and DENIES the government's cross-motion.  The government's revocation of Plaintiff's passport predicated solely on his "confession" was arbitrary and capricious.  The matter is therefore REMANDED for a new hearing within 60 days.

## SUMMARY JUDGMENT EVIDENCE

Plaintiff was born in Yemen in 1951, but immigrated to the United States in 1972 through his uncle who adopted him following the death of Plaintiff's parents.  (Administrative Record ("AR") at 155-160 ¶¶ 1-2 (Declaration of Mosed Shaye Omar).)  Plaintiff became a United States naturalized citizen on April 10, 1978.  (*Id*. at ¶ 3; AR 148 (Certificate of Naturalization).)

In July 2012, Plaintiff traveled to Yemen to assist his youngest daughter K.O. in obtaining a U.S. Passport.  (AR 155 at ¶ 4.)  He attended an interview at the U.S. Embassy in Sana'a in August 2012, but did not hear anything regarding the status of the application for several months during which time he remained in Yemen.  (*Id*. at ¶¶ 4-5.)  Plaintiff is a diabetic and has high blood pressure, and he takes several medications for these conditions, medications which he could not obtain in Yemen.  (*Id*. at ¶ 1.)  By December 2012, Plaintiff had run out of medication and his health had deteriorated.  (*Id*. at ¶ 5.)  He therefore contacted the U.S. Embassy to follow up on the application's status and advised officials that he intended to return to the United States for health reasons.  (*Id*. at ¶ 6.)  He purchased a return flight for late January 2013.  (*Id*.)

A few days before he was due to depart, Plaintiff received a call from the U.S. Embassy regarding his daughter's passport and requesting that he visit the Embassy.  (*Id*. at ¶ 7.)  Upon arriving at the Embassy early the next morning, Plaintiff was asked by a consular officer to provide his passport, which he did.  (*Id*. at ¶ 8.)  Shortly thereafter, he was taken from the waiting room to another "more secure area" and another building with armed and uniformed U.S. military personnel.  (AR 155-56 at ¶ 9.)  To enter the second building, he was escorted through two locked doors which required a special code to open.  (*Id*.)  Plaintiff was then escorted into an interrogation room with two Americans and an interpreter.  (AR 156 at ¶ 11.)  Plaintiff had difficulty understanding the interpreter given his dialect, and at times, he could not tell if the

United States District Court
Northern District of California

interpreter was one of the interrogators.  (*Id.* at ¶ 12.)  He was not advised of his right to remain silent or his right to consult an attorney, nor did he know he had the right to remain silent or to leave and consult with an attorney. (*Id.* at ¶¶ 13-14.)  Plaintiff believed he had to participate in the interview to obtain his daughter's passport and his own.  (*Id.* at ¶ 15.)  He was questioned for an hour regarding his parents and other family members and then he was returned to the general waiting room and told to wait.  (AR 157 at ¶ 18.)  He did not feel he could leave without permission and the Embassy officials had his passport which he needed for his flight home in a few days.  (*Id.*)

After about an hour and half of waiting, he was returned to the interrogation room where he was questioned for another hour.  (*Id.* at ¶¶ 19, 21.)  During this time, he began to feel sick and weak as he had not had any food or water, and he did not have his medication with him.  (*Id.* at ¶ 20.)  His vision also started to blur which is a symptom of his diabetes.  (*Id.* at ¶ 21.)  After an hour of questioning, Plaintiff was again escorted back to the waiting room and told to wait.  (*Id.* at ¶ 21.)  He was unable to contact his family or friends because his cell phone had been taken and there were no phones for public use.  (*Id.* at ¶ 22.)  After several hours of waiting, everyone started leaving the Embassy and at 4:00 p.m. he was "feel[ing] desperate and very afraid" so he told the guard he would do anything to get his passport back and be allowed to leave.  (*Id.* at ¶ 24.)

Plaintiff was then escorted to the interrogation room by two individuals, because his vision had become so blurry he could not tell if it was the same two individuals as before or different individuals.  (AR 157-58 at ¶¶ 24-25.)  He was handed a piece of paper and told to sign it to get his passport returned.  (*Id.* at ¶ 26.)  Plaintiff could not read the paper because his vision was so blurry and the interpreter did not read the document to him or tell him what the document was.  (*Id.* at ¶ 27.)  After he signed it, he was returned to the waiting room and after half an hour he was told that he would not have his passport returned because he had another name.  (*Id.* at ¶ 28.)  Plaintiff was not told that the document he signed was a statement admitting that he had used a false name and committed various other acts, nor was he advised as to why his passport had been confiscated or how he could get it back.  (*Id.* at ¶¶ 29-30.)  Plaintiff was thereafter escorted out of the waiting room and as a result of the stress and lack of food, water, or medication, he had to be

1    taken to a doctor that night.   (*Id.* at ¶¶ 31, 33; Dkt. No. 14-31 at 4.)

2         Plaintiff missed his flight home because he did not have a passport.  (AR 159 at ¶ 35.)

3    Although he repeatedly contacted the Embassy, he was unable to discover anything about his

4    passport until 11 months later, in December 2013, when he received a call from the Embassy

5    advising him to come in.  (*Id.* at ¶¶ 38-39.)   When he visited the Embassy on December 15, 2013,

6    he was given a letter which stated that his passport had been revoked pursuant to 22 C.F.R. §

7    51.62(a)(2) based on his "sworn statement admitting that [his] true identity is Yasin Mohamed Ali

8    Alghazali" which meant that he made a "false statement of material fact" in obtaining his passport

9    application under the name Mosed Shaye Omar.  (*Id.* at ¶ 39; AR 111-12 (Dec. 15, 2013 letter).)

10   The letter also advised Plaintiff of his right to a hearing upon written request.  (AR 364.)

11        In January 2014, Plaintiff contacted the Embassy to advise that his health condition had

12   become dire and he needed to return to the United States for treatment.  (AR 159.)  In February, he

13   was granted a temporary passport and he returned home on February 21, 2014.  (*Id.* at ¶¶ 41-42.)

14   His temporary passport was confiscated by U.S. Customs and Border Protection when he landed at

15   San Francisco International Airport.  (*Id.* at ¶ 41.)  About two weeks after he returned home, he

16   had a heart attack and had a stent placed in his heart.  (*Id.* at ¶ 42; Dkt. No. 14-38 at ¶ 2.)

17        Plaintiff sought administrative review of his passport revocation pursuant to the provisions

18   set forth in the December 15, 2013 letter.  On August 6, 2014, he was notified that his passport

19   revocation hearing was scheduled for September 22, 2014.  (AR 35-36 (Aug. 6, 2014 letter).)

20   The letter advised that the "only issue for consideration and decision will be whether or not the

21   Department satisfied the requirements or conditions of the applicable passport regulations cited as

22   the basis for its adverse action, not your citizenship status."  (*Id.*)  Plaintiff subsequently obtained

23   counsel who attempted to postpone the hearing to allow additional time to prepare, but no

24   postponement was allowed, although the government granted a seven-day extension of the

25   briefing schedule.  (AR 44-90.)

26        On September 22, 2014, Plaintiff and his counsel appeared for the hearing via video link

27   with Bennett S. Fellows, Division Chief of the Office of Adjudication, serving as the hearing

28   officer.  (AR 450-503 (Transcript of Sept. 22, 2014 hearing).)  A month later, Plaintiff was

United States District Court
Northern District of California

4

advised that Deputy Assistant Secretary Brenda Sprague had approved Hearing Officer Fellows'

October 17, 2014 recommendation affirming the revocation of Plaintiff's passport because his use

of the name "Mosed Shaye Omar" to obtain a passport constituted a fraud in violation of 22

C.F.R. § 51.62(a)(2).  (AR 635-640 (Oct. 17, 2014 letter).)

Plaintiff filed this civil action on April 20, 2015 seeking return of his passport and a

declaration that Defendants—the United States Department of State, John Kerry as the Secretary

of State, Brenda Sprague as the Deputy Assistant Secretary of Passport Services, and Michele

Bond as the Acting Assistant Secretary for Consular Affairs, (collectively "Defendants" or "the

government")—violated his rights under the Constitution, the Administrative Procedures Act

("APA"), and 8 U.S.C. § 1504.  (Dkt. No. 1.)  Plaintiff alleges six causes of action under the APA:

(1) Defendants interpretation and application of 8 U.S.C. § 1504 is unconstitutional and exceeds

their statutory authority; (2) Defendants failed to apply the proper "clear and convincing evidence"

standard of proof at his passport revocation hearing; (3) Defendants improperly relied on an

involuntary statement obtained in violation of Plaintiff's Fifth Amendment rights to revoke his

passport; (4) Defendants failed to timely provide Plaintiff with written notice or a prompt hearing

following revocation of his passport in violation of his Fifth Amendment rights; (5) Defendants'

actions were arbitrary and capricious; and (6) Defendants failed to comply with APA rules of

adjudication with respect to Plaintiff's passport revocation hearing.  (Complaint ¶¶ 120-155.)

Plaintiff subsequently filed a motion for preliminary injunction seeking the return of his

passport.  (Dkt. Nos. 14 & 23.)  The Court granted the motion and ordered the government to

return his passport.  (Dkt. No. 52.)  The government has since filed the administrative record and

the parties submitted the now pending cross-motions for summary judgment.  (Dkt. Nos. 41-45,

55, 56.)

## LEGAL STANDARD

The APA provides for judicial review of final agency decisions.  5 U.S.C. §§ 702, 706.

Courts routinely resolve APA challenges to agency administrative decisions by summary

judgment.  *Nw. Motorcycle Ass'n v. U.S. Dept. of Agric.*, 18 F.3d 1468, 1481 (9th Cir. 1994).

However, courts do not utilize the standard analysis for determining whether a genuine issue of

5

material fact exists. *See Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769–70 (9th Cir. 1985). Instead, the administrative agency serves as factfinder, and "the function of the district court is to determine whether ... as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.* The court thus considers the "legal question of whether the agency could reasonably have found the facts as it did." *Id.* at 770. "Because the presence of the administrative record, which the parties have stipulated to, usually means there are no genuine disputes of material fact, it allows the Court to decide whether to set aside the agency determination on summary judgment without a trial." *Sodipo v. Rosenberg*, 77 F. Supp. 3d 997, 1001 (N.D. Cal. 2015) (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam)); *Hunter v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994) ("The motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record.")).

Under the APA, a district court may overturn an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Family Inc. v. U.S. Citizenship & Immigration Servs.*, 469 F.3d 1313, 1315 (9th Cir. 2006) (citing 5 U.S.C. § 706(2)(A)). The agency's factual findings are reviewed for substantial evidence. *Monjaraz-Munoz v. INS*, 327 F.3d 892, 895 (9th Cir. 2003), amended by 339 F.3d 1012 (9th Cir. 2003); *see also Wileman Bros. & Elliott, Inc. v. Espy*, 58 F.3d 1367, 1374–75 (9th Cir.1995) ("When the arbitrary and capricious standard is performing that function of assuring factual support, there is no substantive difference between what it requires and what would be required by the substantial evidence test.") (internal quotation marks omitted), *rev'd on other grounds*, 521 U.S. 457, 117 (1997). The court will not disturb the agency's findings under this deferential standard "unless the evidence presented would compel a reasonable finder of fact to reach a contrary result." *Id.* at 895 (citation omitted). Credibility determinations are likewise subject to the substantial evidence standard, which although deferential, requires "specific, cogent reasons for disbelief"—"a passing reference to insufficiency or disbelief cannot constitute an adequate credibility determination." *Mendoza Manimbao v. Ashcroft*, 329 F.3d 655, 661 (9th Cir. 2003).

# DISCUSSION

## A. Substantial Evidence Does Not Support the Passport Revocation

The government revoked Plaintiff's passport pursuant to 22 C.F.R. § 51.62(a)(2) which allows the State Department to revoke a passport if "[t]he passport has been obtained illegally, fraudulently or erroneously; was created through illegality or fraud practiced upon the Department; or has been fraudulently altered or misused." (AR 111.) The Court "must defer to the agency's finding on these matters unless the record shows that the agency's findings were not supported by substantial evidence—i.e., unless the evidence in the record would compel a reasonable finder of fact to reach a contrary result." *Ursack Inc. v. Sierra Interagency Black Bear Grp.*, 639 F.3d 949, 958 (9th Cir. 2011) (internal citation and quotation marks omitted).

It is undisputed that the sole basis for Plaintiff's passport revocation was the statement that Plaintiff signed at the Sana'a Embassy on January 23, 2013, and in particular, Plaintiff's purported acknowledgement that his name is not Mosed Shaye Omar—the name under which he was naturalized and the name on his passport—but instead, Yasin Mohamed Ali Alghazli. At the passport revocation administrative hearing the statement was the only evidence the government offered to support its contention that Plaintiff had used a false name on his passport application.[1] Plaintiff, for his part, submitted a sworn declaration attesting that his name is "Mosed Shaye Omar." (AR 155.) Plaintiff further attests to the circumstances surrounding the signing of the statement:

- the government asked him to come to the Embassy under false pretenses,
- he signed the statement after being at the Embassy for nine hours without food, water, or the medication that he needs for his serious medical condition,
- no one advised him of his right to leave, to be silent, or his right to consult an attorney,
- after nine hours, he was handed a piece of paper and told to sign it so he could get his

---

[1] AR 496 at 47:4-12 (Hearing Officer Fellows: "Ms. Mody, does the Department have any other documentary evidence other than the signed statement to show that Mr. Omar is actually someone else or is the Department conceding that this, the man here, is Mr. Omar but it's not his birth identity?" Ms. Mody: "So the basis for the Department's revocation was based solely on the sworn statement that it was provided.")

7

1    passport back and obtain his daughter's passport,

2    • he did not read the paper because his vision was blurry due to his medical condition and

3    his knowledge of English is not strong, the paper was not read or explained to him, nor was

4    he provided a translated copy, and

5    • he signed the statement in the name Mosed Shaye Omar.

6    (AR 155-160.)  Accordingly, the only evidence in the record regarding the statement—other than

7    the statement itself—is Plaintiff's declaration attesting that he had no knowledge of what he was

8    signing and that he was coerced into signing the statement based on the government's false

9    representation that if he did so he would obtain his and his daughter's passports.  The government

10   does not offer any other evidence, including any evidence as to how the statement came about. On

11   this record the statement itself is not substantial evidence supporting the government's revocation

12   decision.

13       In *Bong Youn Choy v. Barber*, 279 F.2d 642 (9th Cir. 1960), for example, the Ninth Circuit

14   concluded that the petitioner's statement was involuntary based on his unchallenged testimony

15   that the statement was made after authorities made threats of criminal prosecution and deportation

16   over a period of seven hours, which stretched into the early morning.  279 F.2d at 644–47.  The

17   court concluded that "[a] statement obtained by the government by inducing fear through official

18   threats of prosecution is not voluntarily given" and therefore did not support the government's

19   deportation of the petitioner.  *Id.* at 647.[2]  The statement at issue here is of even less evidentiary

20   value than in *Choy*.  In *Choy*, there was no dispute that the petitioner knew what he was admitting,

21   only whether he was coerced into making the confession.  279 F.2d at 647. Here, in contrast, the

22   undisputed evidence is that Plaintiff *had no knowledge* of the statement's content and that he was

23   coerced into signing it.  Thus, just as the coerced confession could not support the deportation in

24   *Choy*, the statement of which Plaintiff had no knowledge cannot support the revocation of his

25   _____

26   [2] Likewise, in *Navia-Duran v. Immigration & Naturalization Serv.*, 568 F.2d 803 (1st Cir. 1977),
     the petitioner's statement was found involuntary where she was "[i]solated from her friends,

27   inexperienced in American justice, taken from her home to a strange office late at night" and told
     by the immigration agent that she had "no choice." 568 F.2d at 810.

28

United States District Court
Northern District of California

passport.

The government's insistence that the Court should afford the declaration "little" evidentiary weight despite the government's failure to offer any evidence to rebut Plaintiff's declaration renders the Court's review meaningless. There must be some basis in the record for the Court to determine that the statement constitutes "substantial evidence," that is, some evidence that the statement is true. *See Gonzaga-Ortega v. Holder*, 736 F.3d 795, 799-800, 804 (9th Cir. 2013) (discounting petitioner's declaration attesting that he was pressured into admitting that he had smuggled his niece because it was clearly contradicted by a videotaped interrogation statement—in his native Spanish language—that "he had been treated 'fine' since arriving at the immigration station and agreed that he had given his statement 'voluntarily,' not having been forced or threatened in any way" and the immigration officer who took the statement testified at the administrative hearing); *see also In Re: Francisco M. Gonzaga-Ortega*, 2007 WL 4182332, at *1 (BIA Oct. 22, 2007) (noting that the interview was videotaped). Here, there is none. To the contrary, Plaintiff has repeatedly disputed the veracity of the statement by declaring that his name is Mosed Shaye Omar.[3]  (AR 155 at ¶ 1; Dkt. No. 14-38 at ¶ 1.)

The Agency's revocation decision rejects Plaintiff's challenge to the alleged confession because (1) Plaintiff signed the statement, and (2) Plaintiff should have known he was not signing routine paperwork to have his passport returned because the document included photos of adult men and capitalized names. Neither basis is reasonable. First, it ignores Plaintiff's testimony that his medical condition had deteriorated to the point that he "could not read the paper because my vision was so blurred." (AR 158 at ¶ 27.) Second, it ignores the evidence that the signature was coerced. Plaintiff told the embassy employee in the waiting area that "I was sick and I would do anything they wanted so I could leave the Embassy and get my passport back." (AR 157 at ¶ 24.) When he entered the room he was told "just sign this, then go get your passports from the consul."

---

[3] Plaintiff has also offered uncontested evidence that the statement was not true and he is in fact Mosed Shaye Omar. *See, e.g.*, AR 604-605 (sworn affidavits from four individuals who attest that they knew the Plaintiff (identified via photograph) by the name Mosed Shaye Omar, and no other, prior to his entry to the United States).

9

United States District Court
Northern District of California

1  (AR 158 at ¶ 26.)  As in *Navia-Duran*, Plaintiff was "induced to believe that [Embassy officials]

2  controlled [his] fate." *Navia-Duran*, 568 F.2d at 810; *see also United States v. Chan-Jimenez*, 125

3  F.3d 1324, 1326 (9th Cir. 1997) ("When a law enforcement official retains control of a person's

4  identification papers, such as vehicle registration documents or a driver's license, longer than

5  necessary to ascertain that everything is in order, and initiates further inquiry while holding on to

6  the needed papers, a reasonable person would not feel free to depart."); *United States v. Black*, 675

7  F.2d 129, 136 (7th Cir. 1982) (describing the retention of identification documents "beyond the

8  interval required for the appropriate brief scrutiny" as a "watershed point" for purposes of

9  determining whether a stop constitutes a non-coercive police-citizen encounter).  Finally—and

10  most tellingly of all—Plaintiff signed the statement purportedly confessing to being Yasim

11  Mohamed Ali Alghazali in the name Mosed Shaye Omar.  The Agency's decision fails to

12  acknowledge any of this.

13  Given Plaintiff's undisputed declaration disavowing knowledge of the contents of his

14  alleged confession, Plaintiff's "confession" is not evidence of anything let alone substantial

15  evidence that Plaintiff committed fraud by using a false name to obtain his passport.  The

16  government's use of this statement to revoke Plaintiff's passport was arbitrary and capricious in

17  violation of 5 U.S.C. § 706(2).

18  **B.  Plaintiff's Due Process Rights At the Revocation Hearing**

19  This case presents a question of first impression as to the burden of proof for passport

20  revocations.  Both parties agree that neither the applicable statute, 8 U.S.C. § 1504, nor the

21  regulation, 22 C.F.R. § 51.70 et seq., specify the appropriate standard of proof for a passport

22  revocation.  However, given the severe consequences associated with a passport revocation,

23  Plaintiff contends that the revocation must be supported by clear and convincing evidence.  The

24  government suggests that the proper standard of proof is by a preponderance of the evidence.

25  Plaintiff counters that even if this were the correct standard of proof it was not followed here.

26  Before the Court can reach this question, however, it must resolve the threshold question of who

27  bears the burden of proof as the parties have sharply different theories in this regard as well.

28  **1) The Government Bears the Burden of Proof**

1   Under APA, "the proponent of a rule or order has the burden of proof." 5 U.S.C. § 556(d).

2   Thus, the government—as the proponent of the decision revoking Plaintiff's passport—bears the

3   burden. *See Bosma v. Dep't of Agriculture*, 754 F.2d 804, 810 (9th Cir. 1984). The government

4   nonetheless argues, without citation to any statute or regulation, that Plaintiff bears the burden at

5   the administrative hearing stage. At oral argument, the government postulated that it only bore the

6   burden as to the initial passport revocation which occurs when someone in Washington DC

7   reviews the evidence and determines whether a passport should be revoked; thereafter, the burden

8   shifts to the party challenging the determination—here, Plaintiff. The government's unsupported

9   theory contradicts the plain language of the APA as well as its own conduct in this case.

10   The APA provides that the proponent of a rule or order has the burden of proof. 5 U.S.C. §

11   556(d). There is no "order" for the government to be a proponent of until *after* it issues its order

12   of revocation; thus, its suggestion that it only bears the burden of proof when deciding whether to

13   issue an order of revocation contradicts the statute's plain language.

14   Further, the government's communications concerning the administrative hearing stated

15   that it bore the burden at the hearing stage. The letter responding to Plaintiff's request for a

16   hearing, stated:

> the sole purpose of the passport revocation hearing is to establish in
> a formal setting, the basis for the Department's action and to
> determine whether the appropriate procedures were followed in
> revoking the passport. The *only* issue for consideration and decision
> will be whether or not the Department satisfied the requirements of
> conditions of the applicable passport regulations.

20   (AR 6 (emphasis in original).) That is, the issue at the hearing was whether the *Department*

21   satisfied the requirements, not whether Plaintiff can disprove the conclusion that he used a false

22   name to obtain his passport.[4] The letter Plaintiff received 13 months after the Embassy officials

23   confiscated his passport stated that the passport was revoked because "an investigation revealed

24   that you are not Mosed Shaye Omar" as admitted in a "signed sworn statement" and the passport

---

[4] *See also* AR 104 (the pre-hearing written submission of the Department of State) ("[t]he scope of the hearing is limited to a determination of whether the Department acted properly in revoking Mr. Alghazali's passport"..."the scope of the hearing is limited to whether in fact the Department acted properly in determining that Mr. Alghazli's passport was obtained illegally, fraudulently or erroneously.").)

was revoked "[b]ecause you made a false statement of material fact in a passport application." (AR 111.)   However, Plaintiff was not provided any information regarding this investigation and only received a copy of the signed statement a week before his passport revocation hearing—after he had already filed his pre-hearing statement.   In declining to grant Plaintiff an extension of the hearing date once he obtained counsel, the government stated that there was no requirement for pre-hearing written submissions, but that it would provide him with a copy of its pre-hearing statement a week prior to the hearing "as a courtesy." [5]   (AR 69-71.)   It is inconceivable that Plaintiff would bear the burden of proving that he did not use a false name in obtaining his passport where he had no right to know the evidence against him in advance.   Such a practice would run afoul of the fundamental nature of our system of justice.   It is thus unsurprising that the government presented its evidence first at the passport revocation hearing. (AR 455 at 6:11-14 ("Counsel for the Department will present their evidence on which the passport was revoked.   And then the petitioner and his counsel will follow with a statement and/or evidence in his defense.").)   The party who bears the burden on a particular issue presents its evidence first.

The government—as the proponent of its order revoking Plaintiff's passport—bears the burden of proof as the government all but conceded in connection with Plaintiff's administrative hearing.

## 2) The Applicable Standard of Proof

"The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Addington v. Texas*, 441 U.S. 418, 423 (1979) (internal citation and quotation marks omitted).   "At one end of the spectrum is the typical civil case involving a monetary dispute between private parties" wherein the "plaintiff's burden of proof is a mere

---

[5] Plaintiff, through his counsel, repeatedly asked for a copy of the statement upon which his passport revocation was based; however, the government refused to provide it until the parties exchanged simultaneous briefs seven days before the hearing.  (AR 83-90.)  The government similarly declined counsel's request for a continuance of the hearing to allow counsel to prepare as they were only retained a month before the hearing. (AR 52-55.)

United States District Court
Northern District of California

preponderance of the evidence [and] [t]he litigants [] share the risk of error in roughly equal

fashion." *Id*.  At the other end of the spectrum, in a criminal case, the beyond a reasonable doubt

standard applies because "the interests of the defendant are of such magnitude that historically and

without any explicit constitutional requirement they have been protected by standards of proof

designed to exclude as nearly as possible the likelihood of an erroneous judgment." *Id*.  An

intermediate "clear" and "convincing" standard applies where the interests at stake "are deemed to

be more substantial than mere loss of money" or where "particularly important individual

interests" are at stake.  *Id*. at 424.

Clear and convincing evidence requires evidence that could "place in the ultimate

factfinder an abiding conviction that the truth of its factual contentions are highly probable."

*Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (internal citation and quotation marks

omitted); *see also United States v. Yi*, 704 F.3d 800, 806 (9th Cir. 2013) ("Clear and convincing

evidence creates a conviction that the factual contention is highly probable.").  In contrast,

evidence satisfies the preponderance of the evidence standard if it is "reliable and thoroughly

tested." *United States v. Mezas de Jesus*, 217 F.3d 638, 644 (9th Cir. 2000) (internal citation and

quotation marks omitted).

While the preponderance of evidence standard generally applies in ordinary civil cases, the

Supreme Court has applied the clear and convincing evidence standard when certain fundamental

rights are at stake.  *See, e.g.*, *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261,

286 (1990) (cessation of life support); *Santosky v. Kramer*, 455 U.S. 745, 760-70 (1982)

(termination of parental right); *Addington*, 441 U.S. at 433 (civil commitment); *Woodby v.

Immigration & Naturalization Serv.*, 385 U.S. 276, 286 (1966) (deportation); *Chaunt v. United

States*, 364 U.S. 350, 353 (1960) (denaturalization).  Plaintiff, relying *Kent v. Dulles*, 357 U.S. 116

(1958), contends that an individual's right to travel internationally is likewise a fundamental right.

In *Kent*, the Supreme Court held that Congress had not authorized the Secretary of State to inquire

of passport applicants as to any affiliation with the Communist Party finding that "[t]he right to

travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of

law under the Fifth Amendment." *Id*. at 125.  In so holding, the Court observed that "[t]ravel

United States District Court
Northern District of California

abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values." *Id*.

The government counters that the "right to travel" was limited by *Haig v. Agee*, 453 U.S. 280, 306 (1981). In *Haig,* a rogue CIA agent conceded that he had engaged in a campaign to drive the CIA out of countries in which it operates, including by publicly exposing CIA undercover agents and divulging classified information. *Id*. at 283-85. He nonetheless challenged the government's authority to revoke his passport for such conduct. *Id*. at 287. The Supreme Court found that "[r]evocation of a passport undeniably curtails travel, but the freedom to travel abroad with a 'letter of introduction' in the form of a passport issued by the sovereign is subordinate to national security and foreign policy considerations; as such, it is subject to reasonable governmental regulation." *Id*. at 306. "The Court has made it plain that the freedom to travel outside the United States must be distinguished from the right to travel within the United States." *Id.* Indeed, while "[t]he constitutional right of interstate travel is virtually unqualified," "the 'right' of international travel has been considered to be no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment." *Califano v. Aznavorian*, 439 U.S. 170, 176 (1978). "Thus, legislation which is said to infringe the freedom to travel abroad is not to be judged by the same standard applied to laws that penalize the right of interstate travel, such as durational residency requirements imposed by the States." *Id.* at 176-77.

Neither *Haig* nor *Califano* substantively diminished the fundamental nature of the right to travel. The *Haig* Court explicitly noted that it had considered a different question in *Kent*; namely, whether the Secretary of State could deny a passport based on someone's political beliefs and not "whether the Executive had the power to revoke the passport of an individual whose conduct is damaging the national security and foreign policy of the United States." *Haig*, 453 U.S. at 304; *see also Regan v. Wald*, 468 U.S. 222, 241 (1984) (distinguishing *Kent* from cases addressing national security issues noting that the "the Fifth Amendment right to travel, standing alone, [was] insufficient to overcome the foreign policy justifications supporting [a] restriction" on all travel to Cuba). The government undoubtedly has greater leeway in enacting regulations aimed

at national security.  Further, the salient inquiry in *Haig* was the level of judicial scrutiny, not, as here, the level of proof required (in *Haig* the agent conceded the conduct for which his passport was revoked).  Moreover, recent cases emphasize that the right to travel—including the right to international travel—remains a firmly entrenched right of an American citizen.  *See Vartelas v. Holder*, 132 S. Ct. 1479, 1488 (2012) ("Loss of the ability to travel abroad is itself a harsh penalty, made all the more devastating if it means enduring separation from close family members living abroad."); *Nguyen v. I.N.S.*, 533 U.S. 53, 67 (2001) (describing "the absolute right [of a citizen] to enter [the United States'] borders"); *Eunique v. Powell*, 302 F.3d 971, 973 (9th Cir. 2002) ("It is undoubtedly true that there is a constitutional right to international travel.").

The Court is thus persuaded that a citizen's right to travel is a fundamental right and that revocation of a passport, particularly when it occurs while the individual is outside the United States, significantly infringes upon that right.  The question then is what standard of proof is required when that right is implicated.  While neither party points to a case defining the standard of proof applicable to a passport revocation or even a travel restriction generally, the government contends that any liberty interest Plaintiff may have in international travel must be balanced against the government's interest in ensuring the integrity of the passport and protecting the passport system from fraud.  The case the government cites in support of this proposition—*In re Grand Jury Subpoena Duces Tecum (Passports) Dated June 8, 1982*, 544 F. Supp. 721, 726 (S.D. Fla. 1982), is inapposite as it addressed whether an individual could be compelled to produce his passport or whether this would violate his Fifth Amendment privilege against self-incrimination.  In holding that it would not violate the Fifth Amendment, the court noted that given the "unique function of a passport," the government has a "strong interest" in it, and it was not a "private paper."  *Id*.  This reasoning does not shed any light on the government's interest in restricting international travel when weighed against a citizen's right to travel abroad and return home.  The government's citation to *Haig* is likewise not dispositive for, as the Court previously noted, the government unquestionably has a heightened interest where issues of national security are at stake, but there has been no such allegation here.

Plaintiff compellingly posits that the government's interest in preventing the issuance of

15

false passports is at least as great as the government's interest in preventing undocumented individuals who have no legal status in the United States from remaining here and the Supreme Court has held that clear and convincing burden applies to those proceedings.  *See Woodby*, 385 U.S. at 285 ("[t]his Court has not closed its eyes to the drastic deprivations that may follow when a resident of this country is compelled by our Government to forsake all the bonds formed here and go to a foreign land where he often has no contemporary identification.").  The analogy is especially apt where, as here, the practical effect of the revocation of Plaintiff's passport was to prevent him from returning home to the United States for 13 months.

There is of course a temporal nature to the infringement caused by revocation or denial of a passport that must be considered.  The government asserts that, compared to termination of parental rights or civil commitment, a passport revocation does not pose a prolonged or permanent change in status.  While the temporary nature of the revocation may be true when a passport is revoked for failure to pay child support, the circumstances here are different.  The government claims Plaintiff applied for his passport in a false name. There is nothing about such a finding that Plaintiff can easily fix; to the contrary, as the Court previously noted, such a finding places the Plaintiff in a untenable legal position.  If he continues using his name under which the United States granted him citizenship he runs the risk that the government will then accuse him of a using a false name in other contexts, such as paying social security taxes or obtaining a driver's license.  Thus, in these circumstances, the proceedings are more akin to a permanent deprivation requiring a clear and convincing standard.

The Court, however, will not finally rule on this issue.  As the parties note, it is—somewhat surprisingly—a matter of first impression and is not an issue that the Court must resolve to adjudicate this case.  The Court has already decided that the government's decision cannot survive Plaintiff's APA challenge. Moreover, as is discussed below, the government did not even apply the lower preponderance standard at the hearing level and, in any event, the evidence does not satisfy that standard.

### 3)  Plaintiff's Revocation Hearing

The hearing transcript demonstrates that the hearing officer did not apply any particular

United States District Court
Northern District of California

standard of proof.

> [GOVERNMENT COUNSEL] MS. MODY:  It's my understanding that there is no stated burden of proof, and that because this is an informal hearing, there are not very many rules governing the hearing itself, particularly because the hearing officer makes a recommendation to the Deputy Assistant Secretary to make a final determination.

> COMMISSIONER FELLOWS:  As Ms. Mody said, as an administrative hearing and as I sort of laid out at the start, it's very informal.  So the same burdens that you might face in a courtroom don't necessarily apply in this hearing.

> And as Ms. Mody said, after the hearing, I will make a recommendation to the Deputy Assistant Secretary for Passport Services, and she will consider all the relevant submissions, as well as my opinion.

(AR 492 at 43:5-21.)  Nor does it appear that Defendant Sprague, Deputy Assistant Secretary for Passport Services, applied a particular standard of proof to her review as she merely signed her name in the approved line on the hearing officer's recommendation.  The government argues that notwithstanding a complete lack of evidence that either the hearing officer or Defendant Sprague applied a particular standard of proof, the Court should defer to the presumption of regularity in government officials' performance of their duties citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  Even were such a presumption to apply here, it would not shield the decision from a "thorough, probing, in-depth review."  *Id*.

Under the preponderance of the evidence standard, the government's decision to revoke Plaintiff's passport must have been supported by evidence that was "reliable and thoroughly tested."  *Mezas de Jesus*, 217 F.3d at 644.  The agency's factual findings and credibility determinations are subject to a substantial evidence standard; that is, they must be upheld unless there is "evidence in the record [that] would compel a reasonable finder of fact to reach a contrary result."  *Ursack Inc. v. Sierra Interagency Black Bear Grp*., 639 F.3d 949, 958 (9th Cir. 2011) (internal citation and quotation marks omitted).

As explained above, in light of Plaintiff's undisputed evidence, the statement itself—the only evidence upon which the government relies—is not reliable.  To the contrary, on this record,

and, in particular, in light of Plaintiff's unchallenged declaration and supporting documentation, a reasonable finder of fact would be compelled to find that he did not use a false name.  The government now attempts to fault the declaration for not being subject to cross-examination.  Yet the government never sought to cross-examine Plaintiff.  The government suggests that this was because Plaintiff could not be compelled to testify; however, there is no suggestion in the record that the government even *asked* if he would testify.  Instead, the record reflects that Plaintiff's counsel asked if an interpreter would be provided for the hearing and the government responded that it was Plaintiff's obligation to furnish one.  (AR 91.)  Further, regardless of whether Plaintiff testified, nothing prohibited the government from offering evidence as to how the statement came about.  Yet it offered none.

The hearing officer's determination that Plaintiff did not produce documentary evidence rebutting the government's contention that he was not Mosed Shaye Omar is inaccurate.[6]  Despite being given only 23 days to do so, Plaintiff's counsel did in fact obtain additional documentation from Yemen at the hearing officer's request.  (AR 505, 588-612.) Following the hearing, counsel supplemented the record with a copy of Plaintiff's vaccination record from Yemen from 1972 and the sworn statements of four individuals from Yemen who attested that "they know the person whose photo appears above and that his name is Mosed Shaye Omar, and that they know him by this name prior to this entry to the United States of America, and that they do not know of any other name for him." (AR 598-605.)  The hearing officer inexplicably ignored the sworn statements of the four individuals, and only referenced the immunization record which he discounted as "created immediately before [he] came to the United States." (AR 640.)  Plaintiff thus not only obtained additional documentary evidence from Yemen from over 40 years ago, but he did so despite the fact that government counsel noted at the administrative hearing that she had been unable to obtain additional evidence from Yemen in support of the government's allegation

---

[6] In his decision, the hearing officer stated: "petitioner was provided with an opportunity to submit additional documentary evidence of identity after the conclusion of his hearing and was unable to produce a single document from the 20 years he lived in Yemen prior to applying for an immigrant visa.  The one document provided was created immediately before Mr. Alghazali came to the United States."  (AR 640.)

United States District Court
Northern District of California

United States District Court
Northern District of California

1    that Omar was not Plaintiff's true identity because "the situation in Yemen is very dire right now,

2    and it is very difficult to get any documentation."  (AR 496 at 47:13-15.)

3          The government's insistence that the level of detail in statement is evidence of its

4    authenticity because "it contains a level of detail that an investigator could not have fabricated" is

5    unpersuasive. (Dkt. No. 56 at 23:23-24.)  As Plaintiff points out, the information in the statement

6    could well have been derived from Plaintiff's passport and visa applications.

7          Finally, the government's mantra that Plaintiff has never denied that he told Agent Howell

8    that his true identity is Alghazali or otherwise disavowed that he is in fact Alghazali lacks

9    substance.  There is no evidence that Plaintiff ever told Agent Howell that he is Alghazali in the

10   first place.  And Plaintiff has repeatedly declared under penalty of perjury that his name is Mosed

11   Shaye Omar.  (AR 155 at ¶ 1; Dkt. No. 14-38 at ¶ 1.)  That the declaration Plaintiff submitted

12   prior to the hearing did not "wholesale" recant the statement he signed at the Embassy is most

13   likely because the government did not permit him to see the statement until *after* he submitted his

14   declaration.

15         On this record, the government has not satisfied and cannot satisfy its burden of proving

16   that Plaintiff applied for his passport with a false name by, at a minimum, a preponderance of the

17   evidence.  There is thus no reasonable basis to uphold the government's decision revoking

18   Plaintiff's passport.  *Peck v. Thomas*, 697 F.3d 767, 772 (9th Cir. 2012) ("Agency action is

19   presumed to be valid and must be upheld if a reasonable basis exists for the agency decision.")  "A

20   reasonable basis exists where the agency considered the relevant factors and articulated a rational

21   connection between the facts found and the choices made." *Id*. (internal citation and quotation

22   marks omitted).  Such analysis did not occur here.

23         **C.      Remand is the Appropriate Remedy**

24         The final question for the Court is the remedy.  Generally,"[i]f the record before the

25   agency does not support the agency action, if the agency has not considered all relevant factors, or

26   if the reviewing court simply cannot evaluate the challenged agency action on the basis of the

27   record before it, the proper course, except in rare circumstances, is to remand to the agency for

28   additional investigation or explanation."  *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744

United States District Court
Northern District of California

1  (1985); *UOP v. United States*, 99 F.3d 344, 351 (9th Cir. 1996) ("The general rule is that when an

2  administrative agency has abused its discretion or exceeded its statutory authority, a court should

3  remand the matter to the agency for further consideration.").  Plaintiff nonetheless contends that

4  the Court can exercise its authority "as a court of equity conducting judicial review under the APA

5  [with] broad powers to order mandatory affirmative relief." *Nw. Envtl. Def. Ctr. v. Bonneville*

6  *Power Admin.*, 477 F.3d 668, 680-81 (9th Cir. 2007)(citation and internal quotation mark

7  omitted).   The Court disagrees.

8          The case upon which Plaintiff relies, *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir.

9  1981), was decided under the Social Security Act and concluded that remand was unnecessary

10  because the record had been thoroughly developed such that the Court could conclude that there

11  was essentially no basis for the Administrative Law Judge's decision separate and apart from the

12  procedural error so remand would just delay the receipt of benefits.  The same cannot be said here

13  as the opposite is true: the record is not fully developed; indeed, there are gaping holes. The

14  remainder of Plaintiff's argument—that remand would improperly give the government a second

15  bite at the apple and reward the government for its procedural improprieties and that fail to serve

16  as a deterrent for future improprieties—is likewise unpersuasive as Plaintiff has failed to cite any

17  case, outside of the social security context, which authorizes the Court to ignore the general rule

18  regarding remand.

19          The Court thus remands for a new hearing within 60 days.  22 C.F.R. § 51.70(c).   As

20  noted above, the government shall bear the burden of establishing that Plaintiff's passport was

21  properly revoked pursuant to 22 C.F.R. § 51.62(a)(2).  Both parties agree, and indeed request, that

22  the Court retain jurisdiction following remand.  Because it is within the Court's discretion to do

23  so, the Court agrees to retain jurisdiction pending the remand.  *See, e.g.*, *Marceau v. Blackfeet*

24  *Hous. Auth.*, 540 F.3d 916, 921 (9th Cir. 2008) ("[b]ecause of the lengthy course of this litigation,

25  the district court should stay, rather than dismiss, the action against the Housing Authority while

26  Plaintiffs exhaust their tribal court remedies."); *Marsh v. Napolitano*, No. C 11-03734 LB, 2012

27  WL 3877675, at *18 (N.D. Cal. Sept. 6, 2012) (remanding to the Administrative Appeals Office

28  and retaining jurisdiction); *Ctr. for Biological Diversity v. Evans*, No. C 04-04496 WHA, 2005

WL 1514102, at *7 (N.D. Cal. June 14, 2005) (granting plaintiff's motion for summary judgment, remanding to the agency for further proceedings, and retaining jurisdiction); *Bonnichsen v. U.S., Dep't of Army*, 969 F. Supp. 628, 645 (D. Or. 1997) (remanding to "to fully reopen this matter, to gather additional evidence, to take a fresh look at the legal issues involved, and to eventually reach a decision that is based upon all of the evidence, that applies the relevant legal standards, and that provides a clear statement of what the agency has decided, and the reasons for that decision.").[7]

## CONCLUSION

For the reasons stated above, the Court GRANTS Plaintiff's motion for summary judgment and DENIES Defendant's motion for summary judgment.  This matter is remanded to the State Department for proceedings consistent with this Order, including a new hearing within 60 days under 22 C.F.R. § 51.70(c).  The Court's preliminary injunction remains in effect and Plaintiff shall retain possession of his passport during these administrative proceedings, and until he is afforded a full and fair hearing regarding the government's allegation that Plaintiff's passport is subject to revocation under 22 C.F.R. § 51.62(a)(2).[8]  Within 30 days of the conclusion of the administrative proceedings, the parties shall provide a joint status report detailing how they wish to proceed.

This Order disposes of Docket Nos. 55 & 56.

**IT IS SO ORDERED.**

Dated: February 16, 2016

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge

_____

[7] The Court declines to decide whether Plaintiff is entitled to a formal hearing under 8 U.S.C. § 554.  Such issue is better left decided after remand, if necessary.

[8] This order does not foreclose the government from revoking Plaintiff's passport on other grounds, but it is enjoined from doing so on the same basis that it did so in the revocation proceedings at issue in this case.